**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| RAQQA, INC., PITTSBURG LIQUORS INC.; OMDEV, INC.; OM RIYA, INC.; E and B LIQUORS, INC.; MICHAEL CAIRO, and JASON VAN LENTE, for themselves and on behalf of all other persons similarly situated, | Case No. 17-CV-246-MJR-DGW |
| Plaintiffs, | CJRA Track: D |
| v. | Trial Date: December 10, 2018 |
| | Chief Judge Michael J. Reagan |
| NORTHSTAR LOTTERY GROUP, LLC, IGT GLOBAL SOLUTIONS CORPORATION, and SCIENTIFIC GAMES INTERNATIONAL, INC., | |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Raqqa, Inc. ("Raqqa"), Pittsburg Liquors, Inc. ("Pittsburg") Omdev, Inc. ("Omdev"), Om Riya, Inc. ("Om Riya"), E and B Liquors, Inc. ("E and B"), Michael Cairo, and Jason Van Lente, for themselves and on behalf of all other persons similarly situated, complaining of the Defendants Northstar Lottery Group, LLC, IGT Global Solutions Corporation, and Scientific Games International, Inc., on personal knowledge as to their own actions and otherwise on information and belief, state as follows:

### INTRODUCTION

1.      This is a class action brought on behalf of two groups of persons: business entities that serve or served as retailers for the sale of Illinois Lottery instant game tickets ("Retailers" or "Retailer Plaintiffs") and individuals who purchased Illinois Lottery instant game tickets ("Purchasers" or "Purchaser Plaintiffs"). When the context allows, Retailer Plaintiffs and Purchaser Plaintiffs are sometimes referred to collectively as "Plaintiffs." Plaintiffs seek damages from Defendants Northstar Lottery Group, LLC's ("Northstar"), IGT Global Solutions Corporation ("IGT"), and Scientific Games International, Inc. ("Sci-Games"), for those

Defendants' fraud, tortious interference with contract and economic expectancies, and unjust enrichment.

2.      Northstar, a for-profit business, was and is the Private Manager of the Illinois Lottery (sometimes hereafter referred to as, simply, "the Lottery") from July 1, 2011 until its contract was terminated by the state of Illinois in September 2015 (effective on or after January 1, 2017). As the Private Manager of the Lottery, Northstar—with the assistance of and/or at the direction of its members and owners IGT and Sci-Games—oversaw and directed the day-to-day operations of the Lottery, including the design and operation of the individual games offered to Purchasers at point-of-sale locations by Retailer Plaintiffs.

3.      The Lottery generates more than $2 billion in ticket sales each year. As the Private Manager, Northstar's compensation was tied to the Lottery's net income, thus giving Northstar an incentive to generate as much revenue as possible while paying out as little as possible in prizes and commissions. In short, Defendants had a profit motive in the Lottery.

4.      During its tenure, Northstar—with the assistance of and/or at the direction of its members and owners IGT and Sci-Games—routinely designed and operated games as to which it did not pay out all—or sometimes even *any*—of the grand prizes it advertised to purchasers. Purchasers were induced to purchase tickets for these games and retailers were induced to perform work to sell those tickets. But before all (or sometimes any) grand prizes were awarded, Northstar discontinued games. The result was that Northstar locked in profits for itself (and its owners) and eliminated the risk that it would have to pay out winnings to purchasers and bonuses and commissions to the retailers.

5.      Defendants materially misrepresented the actual odds of winning for the games in question. This was fraudulent. Defendants also interfered in retailers' contracts and economic expectancies in relation to retailer commissions and bonuses, interfered in purchasers' contracts in relation to purchase of the tickets, and reaped unjust profits and enrichment.

## THE PARTIES

6.      Plaintiff Raqqa, Inc. is an Illinois corporation with its principal place of business at 10616 Lincoln Trail, Fairview Heights, St. Clair County, Illinois. Raqqa operates a multi-purpose business at that site known as Fairview Lounge. From a date prior to 2010 through 2013, and from 2016 through the present, Raqqa has been a Retailer of Illinois Lottery instant game tickets.

7.      Plaintiff Pittsburg Liquors Inc. is an Illinois corporation with its principal place of business at 16273 Pittsburg Road, Pittsburg, Illinois 62974. Pittsburgh Liquors operates a liquor store at that site. From a date in or prior to 2010 through the present, Pittsburg Liquors or its predecessor has been a Retailer of Illinois Lottery instant game tickets.

8.      Plaintiff Omdev, Inc. is an Illinois corporation with its principal place of business at 405 N. Ardmore Avenue, Villa Park, Illinois 60181. Omdev operates a liquor store at that site known as Ardmore Station Liquors ("Ardmore 1"). From a date prior to 2001 through the present, Ardmore 1 has been a Retailer of Illinois Lottery instant game tickets.

9.      Plaintiff Om Riya, Inc. is an Illinois corporation with its principal place of business at 332 S. Ardmore Avenue, Villa Park, Illinois 60181. Om Riya operates a liquor store at that site known as Ardmore Station Liquors ("Ardmore 2"). From a date prior to 2015 through the present, Ardmore 2 or its predecessor has been a Retailer of Illinois Lottery instant game tickets.

10.      Plaintiff E and B Liquors, Inc. is an Illinois corporation with its principal place of business at 760 North St., Tinley Park, Illinois 60477. E and B operates at liquor store at that site known as E and B Liquors. From a date prior to 2011 through the present, E and B or its predecessor has been a Retailer of Illinois Lottery instant game tickets.

11.      Plaintiff Michael Cairo is an Illinois citizen, residing in Cook County, Illinois, at all times pertinent to this action. Cairo purchased one or more Illinois Lottery instant game tickets during the times pertinent to this action.

12.      Plaintiff Jason Van Lente is an Illinois citizen, residing in Cook County, Illinois, at all times pertinent to this action. Van Lente purchased one or more Illinois Lottery instant game tickets during the times pertinent to this action.

3

13.     Plaintiffs Raqqa, Cairo, and Van Lente are sometimes hereafter referred to as "Representative Plaintiffs."

14.     Defendant Northstar Lottery Group, LLC, ("Northstar") is a business organized and existing under the laws of the state of Illinois with its principal place of business at 180 North LaSalle Street, Suite 1810, in Chicago, Illinois. At all times relevant to the claims asserted herein, Northstar has conducted business throughout the State of Illinois, including in St. Clair County.

15.     Defendant IGT Global Solutions Corporation ("IGT") is a Delaware corporation with its principal place of business in Providence, Rhode Island. IGT is registered to do business in the state of Illinois and is listed by the Illinois Secretary of State as "active" in the state. At all times relevant to the claims asserted herein, IGT has conducted business throughout the State of Illinois, including in this District. IGT maintains an office in this state, at 3201 Robbins Road, Springfield, Illinois. Dane A. Cox is the General Manager of IGT's Springfield, Illinois office. IGT is, and at all relevant times has been, a member of The Greater Springfield Chamber of Commerce (GSCC). The GSCC website shows IGT as providing "Lottery Services" from the Robbins Road location. Defendant IGT is a member of, part owner of, and, in relation to the claims asserted herein, a vendor to, Defendant Northstar. IGT was previously known as "GTECH."

16.     Defendant Scientific Games International, Inc. ("Sci-Games"), is a Delaware corporation with its principal place of business in Alpharetta, Georgia. Sci-Games is registered to do business in the state of Illinois and is listed by the Illinois Secretary of State as "active" in the state. At all times relevant to the claims asserted herein, Sci-Games has conducted business throughout the State of Illinois, including in this District. Sci-Games maintains offices at 2718 West Roscoe Street, Chicago, Illinois (listed as the "Midwest Region" office on Sci-Games website), and at 3401 North California Ave., Chicago, Illinois. Defendant Sci-Games is a member of, part owner of, and, in relation to the claims asserted herein, a vendor to, Defendant Northstar.

4

## JURISDICTION AND VENUE

17.     This action was originally filed on February 6, 2017, in the Circuit Court for the Twentieth Judicial District, St. Clair County, Illinois. On March 8, 2017, Defendant Northstar removed the action to this Court on the basis of diversity jurisdiction as to Plaintiff Raqqa, and supplemental jurisdiction as to all other plaintiffs.

18.     Defendant Northstar thereafter moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). As to the Rule 12(b)(1) portion of its motion, Northstar contended that the plaintiffs had suffered no injury-in-fact and thus lacked Article III standing to pursue the action; Northstar contended that the Court therefore lacked subject matter jurisdiction and that the action should be dismissed. Dkt. No. 13. Plaintiffs moved to remand on the basis that Northstar had, accordingly, disclaimed subject matter jurisdiction, which was Northstar's burden to demonstrate for purposes of removal, and that if the Court does in fact lack subject matter jurisdiction, then the appropriate remedy is remand. Dkt. No. 15. To the extent this Court determines that it lacks subject matter jurisdiction, Plaintiffs maintain that the appropriate remedy is remand.

19.     This Court has subject matter jurisdiction over the claims asserted in this Second Amended Class Action Complaint under 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of different states. In the alternative, the Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) in that this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which any member of the class of plaintiffs is a citizen of a state different from any defendant.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this district. Plaintiff Raqqa, Inc.'s business is located within this district, where it sold Illinois Lottery tickets and from which it transacted business with the Illinois Lottery.

## THE EVENTS

**The Illinois State Lottery**

21.     The Illinois Lottery was established in 1974 under the Illinois Lottery Law, 20 ILCS 1605/1 through 27, as amended. It operates as an independent, cabinet-level department of the state of Illinois.

22.     Initially, the lottery sold tickets only for "passive" games that included weekly drawings. Eventually, instant games, daily games, and more interactive offerings were added, including scratch-off games.

23.     The Illinois Lottery generated over two billion dollars in sales over its first eight years (combined) and over ten billion dollars in sales during its first fifteen years. From 1988 to 2006, the lottery generated more than $1.5 billion in sales each year. In fiscal year 2007, the lottery surpassed $2 billion in sales for the first time and it has exceeded that threshold annually every year since. In each of fiscal years 2014 and 2015 the lottery amassed more than $2.8 billion in sales.

24.     Since 1985, Lottery profits have gone largely to the Illinois Common School Fund, the Capital Projects Fund, and to "Specialty" causes tied to particular games. The Common School Fund receives more than $600 million per year from Lottery revenues. In the current budget-challenged environment, this is funding that the state of Illinois—and particularly Illinois public schools—have come to rely upon. To the extent Defendants have, through their conduct as described below, eroded public confidence in and enthusiasm for the Lottery, they have jeopardized much-needed funding for Illinois public schools and infrastructure.

25.     The Illinois Lottery sells tickets via eligible and accepted point of sale retailers who are licensed by the Department of the Lottery. Typical retailers include gas stations, convenience stores, grocery stores, and the like.

26.     These retailers enter into a valid and enforceable written contract with the Department of the Lottery, known as a Retailer Agreement for Sale of Lottery Tickets ("Retailer Agreement"), or similar. The Retailer Agreement is a license to sell Lottery products under

6

specified terms and conditions and pursuant to which the Lottery agrees to pay retailers certain commissions and bonuses.

27.     Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, and E and B Liquors are retailers of Lottery tickets and parties to such Retailer Agreements.

28.     Under the Retailer Agreements and the terms and conditions incorporated therein, Retailers agree to make available at their point of sale locations lottery tickets for sale to eligible purchasers. The Retailers agree, among other things, to actively work to promote the sale of lottery tickets. Retailers also must allocate space in their point of sale locations for lottery equipment, promotional materials, and signage. Retailers are expected to meet weekly sales targets.

29.     Retailers must expend their own capital for the Lottery tickets which they hope to sell from their point-of-sale locations.

30.     Retailers are required to redeem certain winning tickets presented to the Retailer. Other tickets presented to the Retailer are redeemed according to claim procedures the Retailer is required to follow.

31.     Retailers provide labor to sell and redeem tickets at their places of business.

32.     In exchange for allocating facilities and labor for the promotion, sale, and redemption of lottery tickets as described above, Retailers are paid a commission for ticket sales by the Lottery and also receive a bonus for winning tickets sold or redeemed at their locations. For instance, in 2011, Retailers began earning a 1% cashing bonus for paying out prizes of up to $600. Retailers were expected to earn some $10.5 million in extra compensation per year via the cashing bonus. For a grand prize ticket sold at its location, a Retailer can earn a bonus of hundreds of thousands of dollars.

33.     Lottery tickets are valid and enforceable contracts between the ticket purchaser(s) and the state of Illinois (through the Department of the Lottery). The ticket purchaser pays a specified amount of money for a stated chance to win money. The purchaser pays her money and agrees to follow specified claim procedures in exchange for the opportunity.

**Northstar Takes Over Management of the Lottery**

34.    In 2010, the state of Illinois decided to privatize the management and operation of the Lottery. The State initiated a formal Request for Proposal ("RFP") process, seeking bids by prospective private managers for the Lottery. Based on its bold projections of increased profits, then-Governor Pat Quinn named Defendant Northstar the first Private Manager of the Illinois Lottery. Northstar took over management effective July 1, 2011; it was the first private company in the nation to manage a state lottery.

35.    Defendant Northstar was formed by Defendants IGT (previously known as "GTECH") and Sci-Games. Northstar is owned 80% by IGT and 20% by Sci-Games. Northstar was formed by IGT and Sci-Games in Illinois, as an Illinois entity, specifically for the purpose of bidding on the Illinois Lottery's private manager contract.

36.    Defendants IGT and Sci-Games are leading manufacturers of gaming machines and vendors to the lottery and gaming industry. Both have a history of providing services in the state of Illinois.

37.    On or about July 30, 2010, IGT (then known as GTECH) and Sci-Games submitted a "Step 1 response" to the state of Illinois' Request for Proposal. IGT and Sci-Games referred to themselves together as "[o]perating as the Northstar Lottery Group," and having "joined in an alliance to respond to the Private Manager RFP." The submission letter was signed by the President and Chief Executive Officer of IGT (GTECH) and by the President and Chief Executive Officer of Sci-Games. The cover of the proposal prominently displayed the logos for IGT and Sci-Games, along with Northstar. A legend inside the cover asserted that the proposal contained "confidential, proprietary, and/or trade secret information" of Northstar, IGT, and Sci-Games. IGT and Sci-Games signed (under penalty of perjury) certain disclosures made as a part of the proposal as "Offeror/Subcontractor."

38.    According to the Private Management Agreement ("PMA") between the State and Northstar, Northstar agreed to "coordinate and manage Lottery operations and … introduce opportunities for innovation, agility and market responsiveness for the Lottery."   The State

8

engaged Northstar in order to "increase sales and Net Income from the Lottery while maintaining the highest levels of integrity and responsibility." The PMA had a stated term of ten years.

39.     Pursuant to the PMA, Northstar was to provide all equipment and perform essentially all functions necessary to operate the Lottery. This included, among other things, the creation and management of new Lottery game designs, formats, prices, rules, and payout structures, along with management of existing Lottery games. Northstar also was responsible for recruitment, training, and supervision of Lottery Retailers, and the determination of commissions and other incentives for Lottery Retailers. Northstar was responsible for advertising, promotional materials, and general marketing strategy.

40.     As the day-to-day manager of the lottery, Northstar knew of, or even facilitated, the Lottery's Retailer Agreements with each state-licensed Retailer. Northstar was also aware of the material terms of these agreements, including that Retailers stood to earn commissions in relation to lottery ticket sales and stood to earn bonuses for winning tickets sold or redeemed by the Retailer.

41.     Pursuant to the PMA, Northstar was to prepare game rules consistent with applicable law and was at all times to operate the Lottery in accordance with applicable law.

42.     Pursuant to the PMA, Northstar's payment for operating the Lottery included payment of certain Operating Expenses and Incentive Compensation.

43.     The Operating Expenses were set initially pursuant to Northstar's successful RFP bid. Northstar was paid approximately $130 million for Operating Expenses for each of 2013 and 2014. Operating Expenses were paid out to Northstar on a regular monthly basis.

44.     As Incentive Compensation, Northstar received (subject to several potential adjustments) a percentage of the portion of Lottery Net Income received in a given calendar year that exceeded certain thresholds. For instance, in Contract Year 1, the PMA provided that Northstar would receive 10% of that portion of Net Income exceeding $674 million, 20% of that portion of Net Income exceeding $714 million, and 30% of that portion of Net Income exceeding $754

million. Net Income includes all revenue derived from the Lottery, less paid prizes, commissions to Lottery Retailers, and Operating Expenses.

45.     To maximize Net Income, Northstar had an incentive to maximize the Lottery's revenues and minimize its payouts of prizes (to Purchasers) and commissions (to Retailers).

46.     In addition to this general financial motivation to increase Lottery Net Income, Northstar also had further motivation.

47.     To win the RFP, Northstar had an incentive to make a relatively *low* bid for Operating Expenses. This is because in evaluating competing bids the State would prefer, all other things being equal, a bid that included a lower amount of set monthly payouts pursuant to the PMA.

48.     The PMA also provides that Northstar's compensation would be adjusted downward (pursuant to set formulas) in the event of a Net Income Shortfall. A Net Income Shortfall occurred where Net Income did not reach certain Net Income Targets as set by Northstar's winning RFP bid (or as set in subsequent year business plans).

49.     To win the RFP, then, Northstar also had an incentive to make a relatively *high* bid for annual Net Income Targets. This is because in evaluating the competing bids the State would prefer, all other things being equal, a bid that allowed it to minimize payments to the manager. The higher the Net Income Targets, the greater the likelihood that Net Income Shortfalls would occur and payments to the private manager would be reduced. In fact, Net Income Shortfalls occurred for each of the years ending June 30, 2012, 2013, and 2014.

50.     In light of its motivation to bid low for Operating Expenses, but high for Net Income Targets, Northstar had a strong financial motivation to cover its risk on both of these fronts by increasing the Net Income of the Lottery. As noted above, this motivation is in addition to the general motivation to maximize its Incentive Compensation percentage by reaching the higher Net Income tiers.

51.     To increase the Net Income of the Lottery, Northstar sought to increase Lottery

revenues, i.e., ticket sales, while reducing prize payouts to Purchasers and commissions and bonuses to Retailers.

52.     Northstar successfully boosted lottery ticket sales by hundreds of millions of dollars in each of its first three years as Private Manager. Northstar also managed to reduce prize payouts, as described below.

**IGT's and Sci-Games' Participation in Operation of the Illinois Lottery**

53.     Defendants IGT and Sci-Games created Northstar for the specific purpose of bidding on the Illinois Lottery's private manager RFP, winning that contest, and operating the Illinois Lottery.

54.     Under the PMA, Northstar is required to include in its subcontracts with vendors (including IGT and Sci-Games) a provision stating that vendor services are provided "for the benefit of the State, as well as flow-down provisions." By acting as vendors, IGT and Sci-Games have transacted, or continue to transact, business in this state relevant to the claims asserted herein.

55.     Through their creation, ownership, and control of Northstar, and through their participation as described herein, IGT and Sci-Games had all the same incentives and Illinois Lottery operational knowledge attributable to Northstar.

56.     At the times relevant to this complaint, Northstar performs or performed very few of the overall functions of operating the Illinois Lottery on its own. Many of the functions are or were, instead, performed by IGT and Sci-Games.

57.     For instance, IGT provides or provided the gaming systems, retail equipment, networks, and the internet platform for operation of the Lottery.

58.     IGT also provides or provided the relevant databases used to operate, analyze, and track, lottery functions. These include the "Enterprise Services" ("E.S.") database, an analytics database, a "Business Objects" database or utility, and a player database.

59.     In fact, in operating the Illinois Lottery, Northstar does not or did not provide any of its own services from a technology standpoint; these services are or were all provided by IGT.

11

IGT (and not Northstar) owns this technology.

60.     Northstar users have or had access to certain of IGT's technology systems, or to output from those systems, for purposes of operating the Illinois Lottery.

61.     Northstar and Sci-Games representatives participate or participated in the decision-making process on what new lottery games should be created and offered, and on what terms.

62.     Sci-Games provides or provided Northstar and the Illinois Lottery with access to its private "Game Gallery" website that shows options for game parameters, including artwork, ticket price, and other game characteristics. Based on its experience with lotteries in other states, Sci-Games rates the various offerings with "index numbers" that it calculates.

63.     Based on criteria or desires that Northstar communicates or communicated, Sci-Games then "builds" (or built) a prize structure for new games. Sci-Games creates or created "working papers" describing each game and recommends prize structures for the games.

64.     When a new game is created, packs of tickets are printed and distributed to retailers or sent to a warehouse for storage. Defendant Sci-Games participates or participated in and makes or made a recommendation on what tickets should go into the retail market and what tickets should be stored in a warehouse.

65.     Sci-Games provides or provided information that allows IGT's E.S. database to know precisely how many winning tickets are within any given pack of tickets.

66.     The IGT E.S. system determines or determined approximate daily sales based on percentages of tickets validated (turned in for prizes).

67.     Sales of lottery tickets, for Defendants' tracking purposes, are or were managed by IGT's proprietary systems.

68.     An IGT proprietary algorithm determines or determined when 90% of the low-value tickets in a given ticket pack are sold. Once this has occurred (or 90 days have passed), the IGT system automatically invoices the retailer for settlement of the ticket pack purchase. IGT also then provides a weekly EFT file to the Lottery's bank that sweeps the amount owed by each retailer

from the retailers' bank accounts.

69.     The IGT E.S. system maintains an outstanding tickets and winners file for game tickets.

70.     IGT and Sci-Games provide or provided further functionality with Northstar for the lottery, as described in their operating agreements, in the Lottery PMA, and/or in their vendor agreements.

**Defendants Implement a Scheme to Unlawfully Maximize Profits at the Expense of Plaintiffs**

71.     In operating the Lottery, Defendants designed, planned, and offered hundreds of new instant lottery games. Instant games represented a potential means to dramatically increase ticket sales and profits for the Lottery.

72.     Instant games are preplanned, self-contained products. Each game pays for its planned prizes from the money it raises in sales. A set number of tickets are planned and printed ahead of time, along with a prize structure. The purported odds of winning are published on the tickets themselves or elsewhere.

73.     According to an investigation conducted by the *Chicago Tribune*, Northstar employed a practice of ordering far more tickets than reasonably could be expected to sell, and then discontinuing games before all – or sometimes before *any* – grand prizes had been awarded for the game.

74.     By increasing the number of tickets printed, Northstar could offer bigger and better prizes, attracting more sales. Indeed, instant ticket sales grew dramatically during Northstar's tenure.

75.     For instance, in 2012 Northstar initiated a $5 instant ticket game called "Birthday Surprise" for which it ordered a print of nearly 10 million tickets. This was more than 3.5 times the number of tickets the State ordinarily would sell for a $5 game. Birthday Surprise ostensibly was to include two grand prize winners, each entitled to a $150,000 immediate pay-out along with

$150,000 on the winner's birthday for 20 years. The first grand prize was awarded in March 2013, but that same month—and despite internally calling Birthday Surprise a "current player favorite and well performing" game—Northstar planned to discontinue the game. Birthday Surprise was ended with only 64% of its tickets sold and the second grand prize was never awarded.

76.    Just ten weeks later, a new and nearly identical "Birthday Surprise" game commenced, with the same prize structure and number of tickets as the original. Northstar ended this game within ten months, with only 49% of the tickets sold. No grand prizes were awarded.

77.    In early 2013, Northstar began selling tickets for a new instant game called "The Good Life." According to the *Tribune* investigation, the game was purportedly designed to pay out 78% of its revenue in prizes—most in smaller prizes, but anchored by two prizes of almost $47 million each, paid out at $30,000 per week for 30 years. The Good Life had generated $63 million in sales and paid out $38 million in smaller prizes (61% prize payout percentage) when it was discontinued. Fewer than 15% of the printed tickets had been sold and no grand prizes had been awarded.

78.    Another version of The Good Life offered three large grand prizes. None of those prizes was awarded.

79.    Defendants' scheme to inflate ticket sales and reduce prize payouts extended to other games. The specific games discussed above are for illustrative purposes only. Defendants' scheme to reduce prize payouts in order to increase profits was an aggregate scheme that ran across all scratch-off games.

80.    According to the *Tribune* investigation, for the biggest instant games, the Lottery did not award 23 grand prizes, representing more than 40% of the prizes designed into those games.

81.    This reflected a drastic change in practice for the Lottery and drew a sharp contrast with lotteries run by other states not subject to private management interests.

82.    For comparison, Illinois instant games typically have involved a pre-set number of tickets such that *the complete game would sell out*. For instance, in 2005 the Lottery offered its

14

first $20 instant ticket game. Total prizes were set at $50 million, with three top prizes of $2 million each. The game sold out weeks ahead of schedule.

83.    In 2007, the Lottery offered a St. Patrick's Day game in which 500,000 tickets at $20 each sold out in approximately three weeks leading up to the holiday. Pre-set allotments of hundreds of thousands of tickets for other similar games (and annual St. Patrick's Day games) routinely sold out quickly.

84.    According to the *Tribune* investigation, for the six years preceding Northstar's management of the Lottery, Illinois awarded 87.5% of the grand prizes that its big prize games were designed to pay out. This figure is comparable with the award percentages of other state lotteries. The *Tribune* found, however, that under Northstar, the Lottery award rate dropped to 59.6%. An award rate decrease of this magnitude is not explainable as happenstance or attributable to a lack of interest in the Lottery—indeed, ticket sales were up under Northstar. Rather, it reflects Northstar's implementation of a practice designed and orchestrated by Defendants of discontinuing games early when the profitability of the game was statistically maximized. Because Defendants knew with a reasonable degree of certainty how many tickets had been sold for a game at any given time, how many prizes (and grand prizes) had been claimed for the game, and what the commensurate profitability of the remaining unsold tickets was, Northstar was in a position to, and did, discontinue games before winning tickets could be sold.

85.    Sci-Games generated and distributed reports that tracked the profitability of instant games. Documents produced in the litigation confirm that Sci-Games tracked profitability on a weekly and game-by-game basis, including with reference to a "profit index," "raw profit data," and "prize structure." Reports generated by Sci-Games to this effect were shared with Northstar, including with its Director of Instant Category Business Development Karen Harris, and at least at times, with IGT.

86.    Northstar's sworn testimony provided in this lawsuit confirms that the Sci-Games' account manager for the Illinois Lottery and Northstar's product manager took part in the decision-

making process regarding the termination of scratch-off lottery games. The Sci-Games account manager for at least part of the relevant period was Laurie Pierce. The Northstar product manager during the relevant period was Matthew Hayes.

87.     Documents produced in this litigation by Northstar confirm that Northstar routinely did not award large grand prizes for the games Defendants designed. For all instant games with grand prizes over 1 million dollars that were commenced after September 1, 2011 and ended prior to May 4, 2016, only 55.3 percent of the grand prizes ostensibly available were awarded. Further, for those same games, while there ostensibly was approximately $193,357,217 of grand prize money available, total grand prize money awarded was only $59,217,332. That is to say, under Defendants' stewardship, the Illinois Lottery paid out *less than 31%* of the money ostensibly available as grand prizes for these games. This level of drop-off from pre-Northstar lottery management demonstrates the effectiveness of Defendants' scheme.

88.     In implementing this practice, designed to increase its own profitability, Northstar deceived Purchasers who bought tickets believing that the grand prizes would, in fact, be awarded and that their odds of winning were as reflected on the tickets or where otherwise published.

89.     In fact, the details on the back of the tickets (or elsewhere) alert purchasers that tickets may continue to be sold even if all top prizes have been claimed, but say nothing about the early discontinuation of games before prizes are awarded. In other words, if Defendants believed that they could continue to make money selling tickets for a game without risk of having to pay out further grand prizes (because they already were paid), they disclosed that it may do so. Nowhere, though, does Northstar or any Defendant disclose that they may calculate that they already have maximized the Lottery's Net Income for a particular game and then *discontinue* the game so that it ensures that it will never pay out grand prizes for that game.

90.     In addition to deceiving Purchasers, by discontinuing games Defendants minimized or eliminated the possibility that it would have to pay commissions and bonuses to Retailers. Retailers contracted to provide labor and other consideration pursuant to Retailer Agreements in

exchange for commissions and bonuses for the sale and/or redemption of winning tickets. Where tickets—and particularly *winning* tickets—went unsold because games were discontinued prematurely, Retailers were deprived of commissions and bonuses.

91.     These practices were designed to inflate the profitability of the Lottery at the expense of Purchasers and Retailers, all to result in increased revenues for Northstar and for IGT and Sci-Games. The practices had this effect.

92.     Defendants' scheme extended across all scratch-off games. The scheme was first exposed as a part of the *Chicago Tribune* investigation and publication. Prior to publication of the *Tribune* investigation's findings, Defendants' scheme was concealed from Plaintiffs and the public, and was not publicly-known. Even the *Tribune* investigation did not reveal or disclose the full extent of the scheme, which was and is knowable only by way of discovery conducted in this action.

**The State of Illinois Terminates the Northstar Contract**

93.     Although the PMA was not set to expire until at least 2020, in December 2014 the state delivered to Northstar a Termination Notice. The Attorney General subsequently disapproved of a negotiated termination agreement entered into between the State and Northstar.

94.     Illinois Governor Bruce Rauner then fired Northstar in September 2015. The state reached a termination agreement with Northstar that removed Northstar as Lottery private manager effective January 1, 2017, or whenever a replacement is thereafter chosen.

95.     As a part of the separation, Defendant IGT negotiated a "residual value" benefit that requires the new Illinois Lottery private manager either to continue to use IGT as its vendor, or to pay to IGT up to $14 million per year for up to four years.

**Facts Pertaining to the Representative Plaintiffs**

*Retailer Plaintiffs*

96.     Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, and E and B Liquors are

17

Retailers of Illinois Lottery tickets and parties to Retailer Agreements with the Illinois Department of the Lottery.

97.     Under the Retailer Agreements, the Retailer Plaintiffs provide and have provided, among other things, labor and facilities in order to make lottery tickets available for sale at their business locations. The Retailer Plaintiffs were and are required to redeem certain winning tickets presented to them.

98.     In exchange for the consideration they provide as described above, the Retailer Plaintiffs are entitled to be paid a commission for ticket sales and also to receive a bonus for winning tickets sold or redeemed at their locations.

99.     As the manager and facilitator of Retailer Agreements, Defendant Northstar was and is aware of Plaintiffs Raqqa's, Pittsburg Liquors', Omdev's, Om Riya's, and E and B Liquors' Retailer Agreements with the Illinois Lottery, and was and is aware of the material terms of those contracts.

100.    By discontinuing Illinois Lottery games before all—or sometimes before *any*— grand prizes were awarded, Defendant Northstar interfered intentionally and unreasonably in the Retailer Plaintiffs' contractual relationships with the Department of the Lottery and with the Retailer Plaintiffs' reasonable economic expectations of commissions and bonuses.

101.    Defendant Northstar's interference caused a breach of the Retailer Agreement and/or interference with the Retailer Plaintiffs' business expectancies in that the Retailer Plaintiffs did not receive the full benefit of the bargains for which they provided consideration.

102.    As a result of Defendant Northstar's interference, Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, and E and B Liquors were damaged.

103.    IGT and Sci-Games helped plan, participated in, aided and abetted, and helped carry out this interference through the scheme described herein.

*Purchaser Plaintiffs*

104.    Between 2011 and the present, Plaintiff Cairo regularly purchased Illinois Lottery

18

instant game tickets, including tickets for the games described above.

105.    Between 2011 and the present, Plaintiff Van Lente regularly purchased Illinois Lottery instant game tickets, including tickets for the games described above.

106.    Defendant Northstar designed, planned, and carried out each of these Illinois Lottery instant games. As a part of this, Northstar promoted and advertised the games, determined the ticket price(s) for each game, decided how many tickets would be printed, designed those tickets, and determined what purported odds of winning would be identified on the tickets and/or elsewhere. Northstar also decided what prizes would be awarded for the games, when tickets would be sold, and when the games would be ended.

107.    In light of Defendant Northstar's scheme of discontinuing games early in order to maximize profitability without paying out prizes, the stated odds of winning these games were materially misleading.

108.    Defendant Northstar knew that these odds were materially misleading and intended that Purchasers, such as Plaintiffs Cairo and Van Lente would rely on these materially misleading odds when purchasing tickets.

109.    Plaintiffs Cairo and Van Lente did reasonably rely on the stated odds of winning incorporated into the instant games for which they bought tickets.

110.    Plaintiffs Cairo and Van Lente's opportunities to win were not as stated by Northstar on the tickets.

111.    Plaintiffs Cairo and Van Lente accordingly were damaged.

112.    Through their purchases, Plaintiffs Cairo and Van Lente entered into contracts with the state of Illinois.

113.    Defendant Northstar knew that all purchasers of Illinois Lottery instant game tickets entered into such contracts.

114.    In light of its practice of discontinuing games early in order to maximize profitability, Defendant Northstar knew that the stated odds advertised for these games and set

forth in these contracts were materially misleading.

115.    By discontinuing Illinois Lottery games before all—or sometimes before *any*—grand prizes were awarded, Defendant Northstar interfered intentionally and unreasonably in Plaintiffs Cairo and Van Lente's contractual relationship with the state of Illinois.

116.    Defendant Northstar's interference caused a breach of these contracts in that Plaintiffs Cairo and Van Lente did not receive the full benefit of the bargains for which they provided consideration.

117.    As a result of Defendant Northstar's interference, Plaintiffs Cairo and Van Lente were damaged.

118.    IGT and Sci-Games helped plan, participated in, aided and abetted, and helped carry out this interference through the scheme described herein.

## CLASS ALLEGATIONS

119.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action for themselves individually and as representatives of classes of all other similarly situated persons. Plaintiffs intend to seek certification of at least two classes: (a) the "Retailer Class"; and (b) the "Purchaser Class."   The Retailer Class and the Purchaser Class are sometimes referred to collectively as "the Classes."

120.    Plaintiffs initially describe the Retailer Class as:

All persons who were or are parties to a contract to sell at retail Illinois Lottery instant game tickets at any time between July 1, 2011 and the present.

121.    Plaintiffs initially describe the Purchaser Class as:

All natural persons who purchased one or more Illinois Lottery instant game tickets at any time between July 1, 2011 and the present.

122.    Excluded from the Classes above are Defendants and any of their members, officers or directors and their immediate families, and the Court and its immediate family.

123.     Plaintiffs reserve the right to amend or modify the class definitions and/or to move for certification of a class or classes defined differently than as set forth above depending on the facts or law as discovered in this action.

124.     Numerosity, Fed. R. Civ. P. 23(a)(1): Each of the proposed Classes is sufficiently numerous that joinder of all members of the class is impracticable. Plaintiffs do not know the exact size of the Classes because such information requires discovery necessary to identify the number of Retailers and Purchasers of Illinois Lottery instant game tickets during the relevant time period. The exact number of all class members may be ascertained by appropriate discovery, but it is Plaintiffs' belief that the Retailer Class numbers at least in the thousands and the Purchaser Class numbers in the hundreds of thousands or more. Class members may be notified of the pending action by email, mail, and by publication as necessary.

125.     Commonality, Fed. R. Civ. P. 23(a)(2): There are questions of fact and law common to each Class or to the Classes together, which common questions predominate over questions affecting only individual members. These common questions include, but are not limited to, the following:

     a.     Whether Defendants implemented a scheme to increase profitability (and their own revenues) at the expense of Retailers and Purchasers;

     b.     Whether Defendants implemented a scheme of ordering more game tickets than reasonably could be sold so that it could falsely advertise, promote, and offer more lucrative winning prizes;

     c.     Whether Defendants implemented a scheme of discontinuing lottery games before grand prizes were awarded;

     d.     Whether Defendants mis-stated the odds of winning on the various game tickets it designed and sold (or where otherwise published);

     e.     Whether Defendants' scheme unlawfully interfered with contracts between Purchasers and the state of Illinois, Department of the Lottery;

21

     f.   Whether Defendants' scheme unlawfully interfered with contracts between Retailers and the Department of the Lottery and/or with the economic expectancies of Retailers;

     g.   Whether Defendants employed a deceptive, misleading, or unfair method of competition;

     h.   Whether Defendants were unjustly enriched at the expense of Plaintiffs.

126.    <u>Typicality, Fed. R. Civ. P. 23(a)(3):</u> The claims of the Representative Plaintiffs are typical of the claims of the members of the Classes. Representative Plaintiffs, like all other members of the Classes, have sustained damages arising from Defendant's conduct, as alleged herein. The Representative Plaintiffs and the members of the Classes were and are similarly or identically harmed by the same unlawful conduct engaged in by Defendants.

127.    <u>Adequacy, Fed. R. Civ. P. 23(a)(4):</u> Representative Plaintiffs can and will fairly and adequately represent the interests of the Classes and have no interests that conflict with or are antagonistic to the interests of the Classes. Plaintiffs have retained attorneys who are skilled, competent, and experienced in complex and class action litigation, and who will vigorously assert the claims on behalf of the Class members. No conflict exists between the Representative Plaintiffs and the Classes.

128.    <u>Predominance and Superiority, Fed. R. Civ. P. 23(b)(3):</u> The class action is an appropriate method for the fair and efficient adjudication of this controversy given, among other things, the following:

     a.   Common questions of fact and law predominate over any individual questions that may arise, such that the class action mechanism is superior to other available means for the fair and efficient adjudication of this dispute;

     b.   There will be enormous economies to the Court and the parties in litigating the common issues in a class action instead of in multiple individual claims;

     c.   Class treatment is required for optimal resolution of this matter and for limiting the

court-awarded reasonable legal expenses incurred by class members;

d. Despite the relatively small size of individual class members' claims, their aggregate volume, coupled with the economies of scale in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with the cost of individual litigation; and

e. The trial of this case as a class action will be fair and efficient because the questions of law and fact which are common to the plaintiff Classes predominate over any individual issues that may arise.

## CLAIMS FOR RELIEF

### COUNT I

**Tortious Interference with Contract**

**(Retailer Plaintiff Class against All Defendants)**

129.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 128 as if fully set forth herein.

130.    Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class entered into valid and enforceable contracts with the state of Illinois, Department of the Lottery.

131.    Retailer Plaintiffs performed all functions required of them under those contracts.

132.    Pursuant to those contracts, Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class were entitled to commissions and bonuses in relation to their sale and redemption of winning lottery tickets.

133.    Defendants were aware of the existence of those contracts and of the material terms thereof.

134.    By prematurely discontinuing Lottery games and/or otherwise implementing its scheme to maximize profits at the expense of Plaintiffs, Defendants intentionally and unjustifiably induced breach of Retailer Plaintiffs' contracts in that Retailer Plaintiffs did not receive the benefit

23

of bargain in the form of commissions and bonuses to which they were entitled. This breach was caused by Defendants.

135.    Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class were damaged by proximate reason of the foregoing.


**COUNT II**

**Tortious Interference with Prospective Economic Advantage**
**(Retailer Plaintiff Class against All Defendants)**

136.    Plaintiffs repeat and re-alleged each and every allegation set forth in paragraphs 1 through 128 as if fully set forth herein.

137.    To the extent Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class did not contract with the state of Illinois, Department of the Lottery, to receive payments for particular Lottery games or for particular ticket sales, they nonetheless had a reasonable expectation of receiving future commissions and bonuses for the sale and/or redemption of Lottery tickets.

138.    Defendants were aware of the existence of Retailer Plaintiffs' expectancy.

139.    By prematurely discontinuing Lottery games and/or otherwise implementing its scheme to maximize profits at the expense of Plaintiffs, Defendants intentionally and unjustifiably interfered with Retailer Plaintiffs' expectancy. This interference resulted in breach or termination of Plaintiffs' expectancy, in that Retailer Plaintiffs did not receive their reasonably expected commissions and bonuses for the sale and/or redemption of future Lottery tickets.

140.    Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class were damaged by proximate reason of the foregoing.

24

COUNT III

**Tortious Interference with Contract**

**(Purchaser Plaintiff Class against All Defendants)**

141.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 128 as if fully set forth herein.

142.    Plaintiffs Cairo and Van Lente, and the Purchaser Plaintiff Class entered into valid and enforceable contracts with the state of Illinois, Department of the Lottery.

143.    Purchaser Plaintiffs performed all functions required of them under those contracts.

144.    Pursuant to those contracts, Purchaser Plaintiffs paid monies in exchange for purported chances to win prizes.

145.    Purchaser Plaintiffs' contracts stated or incorporated certain odds of winning the various prizes.

146.    Defendants were aware of the existence of those contracts and of the material terms thereof.

147.    By prematurely discontinuing Lottery games and/or otherwise implementing its scheme to maximize profits at the expense of Plaintiffs, Defendants intentionally and unjustifiably induced breach of the contracts in that Purchaser Plaintiffs did not actually receive the chance they bargained for to win the prizes. This breach was caused by Defendants.

148.    Plaintiffs Cairo and Van Lente, and the Purchaser Plaintiff Class were damaged by proximate reason of the foregoing

COUNT IV

**Common Law Fraud**

**(Purchaser Plaintiff Class against All Defendants)**

149.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 128 as if fully set forth herein.

150.    As manager of the Lottery, Defendant Northstar was responsible for the creation

25

and management of new Lottery game designs, formats, prices, rules, and payout structures, along with management of existing Lottery games. Northstar was also responsible for advertising, promotional materials, and general marketing strategy.

151.    Northstar performed these functions together with, at the direction of, and/or with the assistance of IGT and Sci-Games.

152.    In its management of the Lottery, and with the assistance of and at the direction of IGT and Sci-Games, Northstar implemented a scheme to maximize profits at the expense of Purchaser Plaintiffs by designing, advertising, and offering Lottery instant games in which certain purportedly available grand prizes would never be awarded and/or the stated odds of winning were false or materially misleading.

153.    Defendants knew that some grand prizes would never be awarded and/or that the stated odds of winning were false or materially misleading.

154.    Defendants intended for Plaintiffs Cairo and Van Lente, and for the Purchaser Plaintiff Class, to rely on the truth of its representations as to the available grand prizes and the odds of winning. Cairo and Van Lente, and the Purchaser Plaintiff Class did reasonably so rely.

155.    Purchaser Plaintiffs were damaged by proximate reason of the foregoing.

## COUNT V

## Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505
## (Purchaser Plaintiff Class against All Defendants)

156.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 155 as if fully set forth herein.

157.    As manager of the Lottery, Defendant Northstar was responsible for the creation and management of new Lottery game designs, formats, prices, rules, and payout structures, along with management of existing Lottery games. Northstar was also responsible for advertising, promotional materials, and general marketing strategy.

158.    Northstar performed these functions together with, at the direction of, and/or with

the assistance of IGT and Sci-Games.

159.   In its management of the Lottery, and with the assistance of and at the direction of IGT and Sci-Games, Northstar implemented a scheme to maximize profits at the expense of Purchaser Plaintiffs by designing, advertising, and offering Lottery instant games in which certain purportedly available grand prizes would never be awarded and/or the stated odds of winning were false or materially misleading.

160.   Defendants knew that some grand prizes would never be awarded and/or that the stated odds of winning were false or materially misleading. Defendants' design, implementation, promotion, advertising, and offering of Lottery instant games was deceptive, misleading, and unfair to Purchasers.

161.   Defendants intended for Plaintiffs Cairo and Van Lente, and for the Purchaser Plaintiff Class, to rely on the truth of its representations as to the available grand prizes and the odds of winning.

162.   Purchaser Plaintiffs were damaged by proximate reason of the foregoing.

163.   Defendants' conduct as described herein implicates consumer protection generally.


## COUNT VI
## Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505
### (Retailer Plaintiff Class against All Defendants)

164.   Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 155 as if fully set forth herein.

165.   As manager of the Lottery, Defendant Northstar was responsible for the creation and management of new Lottery game designs, formats, prices, rules, and payout structures, along with management of existing Lottery games. Northstar was also responsible for advertising, promotional materials, and general marketing strategy.

166.   Northstar performed these functions together with, at the direction of, and/or with the assistance of IGT and Sci-Games.

167.    In its management of the Lottery, and with the assistance of and at the direction of IGT and Sci-Games, Northstar implemented a scheme to maximize profits at the expense of Plaintiffs by designing, advertising, and offering Lottery instant games in which certain purportedly available grand prizes would never be awarded and/or the stated odds of winning were false or materially misleading.

168.    Defendants knew that some grand prizes would never be awarded and/or that the stated odds of winning were false or materially misleading. Defendants' design, implementation, promotion, advertising, and offering of Lottery instant games was deceptive, misleading, and an unfair method of competition.

169.    Defendants intended for Plaintiffs Raqqa, Pittsburg Liquors, Omdev, Om Riya, E and B Liquors,, the Retailer Plaintiff Class, and the Purchaser Plaintiff Class to rely on the truth of their representations as to the available grand prizes and the odds of winning.

170.    Retailer Plaintiffs were damaged by proximate reason of the foregoing.

171.    Defendants' conduct as described herein implicates consumer protection generally.


## COUNT VII

### Unjust Enrichment

### (Retailer Plaintiff Class and Purchaser Plaintiff Class against All Defendants)

172.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 171 as if fully set forth herein.

173.    During the years when it managed the lottery, Defendant Northstar reaped enormous profits from the operations. Defendants IGT and Sci-Games, too, reaped enormous profits both from their ownership of Northstar as well as from their vendor contracts with Northstar for operation of the lottery.

174.    Northstar, IGT, and Sci-Games together devised and implemented their scheme to maximize profits at the expense of retailers and purchasers in the operation of the Illinois Lottery.

175.    Plaintiffs Cairo and Van Lente, along with the Purchaser Plaintiff Class, bought

tickets for Lottery games, contributing to the Lottery revenues, to Northstar's compensation, and to IGT's and Sci-Games' profits.

176.    Purchaser Plaintiffs contracted for the chance to win certain purportedly available grand prizes which in reality would never be awarded and/or as to which the stated odds of winning were false or materially misleading. Revenues from these purchases inured to the benefit of Northstar (and, ultimately, of IGT and Sci-Games).

177.    Retailer Plaintiffs provided labor and other consideration for the promotion, advertising, and sale and redemption of, Lottery tickets. This consideration inured to the benefit of Northstar (and, ultimately, of IGT and Sci-Games).

178.    By prematurely discontinuing Lottery games and/or otherwise implementing their scheme to maximize profits at the expense of Plaintiffs, Defendants realized the ticket sale profits from Purchaser Plaintiffs' purchases, enabled by Retailer Plaintiffs' labor, but did not permit either Purchasers or Retailers to recoup the benefit of their bargain. Defendants unjustly retained these benefits to the detriment of Plaintiffs, as Defendants have deprived Plaintiffs of their property and labor.

179.    Defendants' retention of the benefit violates fundamental principles of justice, equity, and good conscience.

180.    Defendants accepted the benefit from Plaintiffs and it would be inequitable for Defendants to retain that benefit.

181.    In fairness and equity, Defendants should disgorge the monies by which they have been enriched at the Plaintiffs' expense.

## Count VIII
### Civil Conspiracy
### (Retailer Plaintiff Class and Purchaser Plaintiff Class against All Defendants)

182.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 181 as if fully set forth herein.

183.    At all times relevant herein, Northstar, IGT, and Sci-Games either jointly, individually, or in any combination of them, entered into an agreement or agreements to commit one or more of the wrongs alleged in Counts I – VII.

184.    At all times relevant herein, pursuant to and in furtherance of the aforesaid agreement(s), Northstar, IGT, and Sci-Games, either jointly, individually, or in any combination of them, committed one or more of the wrongs alleged in Counts I – VII.

185.    At all times relevant herein, pursuant to and in furtherance of the aforesaid agreement(s), Northstar, IGT, and Sci-Games, either jointly, individually, or in any combination of them, acted in concert to commit one or more of the wrongs alleged in Counts I – VII.

186.    One or more of the aforesaid wrongs alleged in Counts I – VII included overt acts or omissions committed by Northstar, IGT, and/or Sci-Games, either jointly, individually, or in any combination of them, pursuant to and in furtherance of the aforesaid agreement.

187.    As a direct and proximate result of one or more of the aforesaid overt acts or omissions, Plaintiffs have suffered damages.

188.    One or more of the aforesaid overt acts or omissions were committed intentionally, willfully, and with malice.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and on behalf of the Class(es), pray for relief as follows:

A.  Certifying the Class or Classes identified herein and appointing Plaintiffs and their counsel to represent the Class(es);

B.  Entering judgment in favor of Plaintiffs and the Classes jointly and severally against Defendants;

C.  Awarding Plaintiffs and the Classes compensatory damages in an amount according to proof at trial;

D.  Awarding to Plaintiffs and the Classes the equitable remedy of disgorgement of

Defendants' unjust enrichment, in an amount according to proof at trial;

E.  Awarding to Plaintiffs their costs incurred in bringing this suit, along with Plaintiffs' attorneys' fees; and

F.  Granting such other and further relief as the Court deems appropriate.


Dated:  May 4, 2018                          Respectfully submitted,


_s/ Derek Y. Brandt_
Derek Y. Brandt #6228895
**MCCUNE WRIGHT AREVALO, LLP**
100 North Main Street, Suite 11
Edwardsville, Illinois 62025
T: (618) 307-6116
dyb@mccunewright.com

Tor A. Hoerman #6229439
Kenneth Brennan #6239037
Chad Finley #6308995
Tyler Schneider #6313923
**TORHOERMAN LAW LLC**
210 S. Main Street
Edwardsville, Illinois 62025
T: (618) 656-4400
tor@thlawyer.com
kbrennan@thlawyer.com
cfinley@thlawyer.com
tyler@thlawyer.com

Timothy Hoerman #6256097
323 N. Washington Street
Westmont, Illinois 60569
T: (773) 220-5899
timhoerman@sbcglobal.net

Robert Sprague #2693690
**SPRAGUE & URBAN**
26 E Washington St
Belleville, Illinois 62220
T: (618) 223-8383
rsprague@spragueurban.com

31

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2018, I electronically filed the foregoing **Second Amended Class Action Complaint** with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record in this action, and I also sent a copy of the filed Second Amended Complaint via U.S. Mail service, postage prepaid, on Defendants IGT Global Solutions Corporation and Scientific Games International, Inc., via their registered agent.

*s/ Derek Y. Brandt*
Derek Y. Brandt