## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RAQQA, INC.; OMDEV, INC.; OM RIYA, INC.; E and B LIQUORS, INC.; MICHAEL CAIRO, and JASON VAN LENTE, for themselves and on behalf of all other persons similarly situated, <br><br>          Plaintiffs, <br>    v. <br><br> NORTHSTAR LOTTERY GROUP, LLC, IGT GLOBAL SOLUTIONS CORPORATION, and SCIENTIFIC GAMES INTERNATIONAL, INC., <br><br>          Defendants. | Case No. 17-CV-246-SMY-MAB <br><br> CJRA Track: D <br> Trial Date: July 13, 2020 <br> Judge: Hon. Staci M. Yandle |

## FOURTH AMENDED CLASS ACTION COMPLAINT

# Table of Contents

I.        INTRODUCTION ................................................................................................ 1

II.       THE PARTIES .................................................................................................. 4

III.      JURISDICTION AND VENUE ............................................................................ 5

IV.       THE EVENTS .................................................................................................. 7

   A.      The Illinois State Lottery ...................................................................... 7

   B.      Northstar Takes Over Management of the Illinois Lottery ......................... 9

   C.      IGT's and Sci-Games' Participation in Operation of the Illinois Lottery ... 13

   D.      Defendants Implement Scheme to Unlawfully Maximize Profits at the
           Expense of Plaintiffs by Overstating the Odds of Winning Grand Prizes  15

       1.    *Defendants Misstate the Grand Prize-Winning Odds of "Game 909" By Almost
             Ten Percent* .................................................................................. 16

       2.    *Defendants Overstate the Odds of Winning by Failing to Account for or Disclose
             a Practice of Terminating Games Early When To Do So Served Game
             Profitability* .................................................................................. 17

       3.    *Defendants Use "Stratified Random Distribution" as an Undisclosed Scheme to
             Sell Discrete Groups of Tickets for Which the Odds of Winning a Grand Prize
             were Zero* ..................................................................................... 24

   E.      The State of Illinois Terminates the Northstar Contract .......................... 31

V.        FACTS PERTAINING TO THE REPRESENTATIVE PLAINTIFFS ............................ 31

   A.      Retailer Plaintiffs ............................................................................... 31

   B.      Purchaser Plaintiffs ............................................................................ 32

VI.       CLASS ALLEGATIONS ..................................................................................... 33

VII.      CLAIMS FOR RELIEF ....................................................................................... 41

PRAYER FOR RELIEF .................................................................................................... 48

Plaintiffs, Raqqa, Inc., Omdev, Inc., Om Riya, Inc., E and B Liquors, Inc., Michael Cairo, and Jason Van Lente, for themselves and on behalf of all other persons similarly situated, complaining of the Defendants Northstar Lottery Group, LLC (<u>"Northstar"</u>), IGT Global Solutions Corporation (<u>"IGT"</u>), and Scientific Games International, Inc. (<u>"Sci-Games"</u>), on personal knowledge as to their own actions and otherwise on information and belief, state as follows:

## I.   INTRODUCTION

1.   This is a class action brought on behalf of two groups of persons: business entities that serve or served as retailers for the sale of Illinois Lottery instant game tickets (<u>when necessary, referred to as</u> "Retailers" or "Retailer Plaintiffs") and individuals who purchased Illinois Lottery instant game tickets (<u>when necessary, referred to as</u> "Purchasers" or "Purchaser Plaintiffs"). Plaintiffs seek damages from Defendants Northstar, IGT, <u>and</u> Sci-Games, for those Defendants' fraud, <u>unfair conduct</u>, tortious interference with contract and economic expectancies, and unjust enrichment.

2.   <u>Defendants IGT and Sci-Games are the direct owners of 100 percent of the membership interest in Defendant Northstar, a limited liability company IGT and Sci-Games created under the laws of the state of Illinois for the purpose of submitting a bid to serve as Private Manager of the Illinois Lottery.</u>

3.   <u>IGT and Sci-Games are large international corporations. They were and continue to be two of the largest vendors providing services to lotteries around the globe. Their services and methods described below are consistent across the many states and countries where they have contracts. In or after 2011, these companies began to provide these services as private managers of state lotteries throughout the United States. This class action complaint addresses their unlawful conduct only as it relates to Illinois.</u>

4.   Northstar, a for-profit <u>limited liability corporation, with IGT and Sci-Games as its owners and partners</u>, was the Private Manager of the Illinois Lottery (sometimes

hereafter referred to as, simply, "the Lottery") from July 1, 2011 until its contract was terminated by the state of Illinois in September 2015 (effective on or after January 1, 2017). As the Private Manager of the Lottery, Northstar—with the assistance of and/or at the direction of its members and owners IGT and Sci-Games—oversaw and directed the day-to-day operations of the Lottery, including the design and operation of individual <u>instant lottery</u> games offered to Purchasers at point-of-sale locations by Retailer Plaintiffs.

5.      The <u>Illinois</u> Lottery generates more than $2 billion in ticket sales each year. As the Private Manager, Northstar's compensation was tied to the Lottery's *net income*. <u>Net income is generally defined as revenues minus costs and payouts. This compensation agreement gave</u> Northstar an incentive to generate as much lottery revenue as possible while paying out as little as possible in prizes and commissions. In short, Defendants had a profit motive in the <u>operation of the</u> Lottery.

6.      During its tenure, Northstar—with the assistance of and/or at the direction of its members and owners IGT and Sci-Games—<u>employed a number of fraudulent and unfair practices designed to increase lottery revenue while decreasing prize, commission, and incentive payouts to purchasers and retailers. These practices included, at a minimum: materially misrepresenting the actual odds of winning instant game grand prizes</u>; routinely <u>designing</u> and <u>operating</u> games as to which it did not pay out all—or sometimes even *any*—of the grand prizes advertised to purchasers; <u>and employing an undisclosed grand prize ticket placement and distribution scheme called "Stratified Random Distribution" which allowed it to sell hundreds of millions of dollars' worth of instant game tickets from discrete ticket pools which Defendants knew did not contain any grand prize ticket.</u>

7.      Purchasers were induced to purchase tickets for these games and retailers were induced to perform work to sell those tickets. <u>Misrepresenting the odds of winning instant game</u> grand prizes <u>was fraudulent</u>. <u>Terminating</u> games <u>early to avoid paying out</u>

2

advertised grand prizes was unfair and deceptive. Selling tickets from discrete ticket pools which Defendants knew contained no grand prize winner was fraudulent, unfair, and deceptive. The result of each practice was that Northstar—with the assistance of and/or at the direction of IGT and Sci-Games—increased Lottery revenue and decreased (or, at times, eliminated) the risk that the Lottery would have to pay out winnings to purchasers and bonuses and commissions to retailers. This coincided with Defendants' profit incentive in the Lottery's net income.

8.   Because IGT and Sci-Games, the owners of Northstar, participate in the operation of lotteries throughout the United States and the world, the Defendants are well aware that their unlawful schemes disproportionality impact the poor—those least able to afford being defrauded. "Lotteries take a far greater percentage of income from those who are already economically disadvantaged. This is especially true of scratch tickets, which are bought much more heavily in low-income neighborhoods." Andrew Clott, The Predatory Nature of State Lotteries," Loyola Consumer Law Review, Volume 28:1 137, 154 (2015).

9.   Numerous studies of lotteries in Illinois and throughout the United States bear this out. The poorest drive the majority of state lottery revenues. *Id.* at 149. "Socioeconomic status (SES) of consumers is by far the strongest predictor in determining whether they play the lottery [and] the highest concentration of lottery players come from the lowest strata of SES." *Id.*

10.   The highest concentrations of players are typically in the poorest cities. Spector, Dina, *et al.*, "18 Signs That The Lottery Is Preying On America's Poor," Business Insider, Apr. 6, 2012. Of six counties studied on the west side of Chicago in 2008, the two with the highest unemployment generated the highest per capita sales. *Id.*

11.   Lower income consumers are more likely to see the lottery as a financial "Hail Mary" strategy. Clott, *supra* at 150. Yet data show that state lotteries have the lowest

payout rate of any form of legal gambling. Spector, *supra*. To make matters worse, ordinary consumer protections do not protect lottery ticket purchasers. The federal government no longer exercises any authority over the substance of state lottery advertising, and state lotteries are exempt from the regulatory power of the Federal Trade Commission. Clott, *supra* at 146.

## II.   THE PARTIES

12.   Plaintiff Raqqa, Inc. is an Illinois corporation with its principal place of business at 10616 Lincoln Trail, Fairview Heights, St. Clair County, Illinois. Raqqa operates a multi-purpose business at that site known as Fairview Lounge. From a date prior to 2010 through 2013, and from 2016 through the present, Raqqa has been a Retailer of Illinois Lottery instant game tickets.

13.   Plaintiff Omdev, Inc. is an Illinois corporation with its principal place of business at 405 N. Ardmore Avenue, Villa Park, Illinois 60181. Omdev operates a liquor store at that site known as Ardmore Station Liquors ("Ardmore 1"). From a date prior to 2001 through the present, Ardmore 1 has been a Retailer of Illinois Lottery instant game tickets.

14.   Plaintiff Om Riya, Inc. is an Illinois corporation with its principal place of business at 332 S. Ardmore Avenue, Villa Park, Illinois 60181. Om Riya operates a liquor store at that site known as Ardmore Station Liquors ("Ardmore 2"). From a date prior to 2015 through the present, Ardmore 2 or its predecessor has been a Retailer of Illinois Lottery instant game tickets.

15.   Plaintiff E and B Liquors, Inc. is an Illinois corporation with its principal place of business at 760 North St., Tinley Park, Illinois 60477. E and B operates at liquor store at that site known as E and B Liquors. From a date prior to 2011 through the present, E and B or its predecessor has been a Retailer of Illinois Lottery instant game tickets.

4

16.     Plaintiff Michael Cairo is an Illinois citizen, residing in Cook County, Illinois, at all times pertinent to this action. Cairo purchased one or more Illinois Lottery instant game tickets during the times pertinent to this action.

17.     Plaintiff Jason Van Lente is an Illinois citizen, residing in Cook County, Illinois, at all times pertinent to this action. Van Lente purchased one or more Illinois Lottery instant game tickets during the times pertinent to this action.

18.     Plaintiffs Raqqa, OmDev, Om Riya, E and B Liquors, Cairo, and Van Lente are sometimes hereafter referred to as "Representative Plaintiffs."

19.     Defendant Northstar Lottery Group, LLC, is a business organized and existing under the laws of the state of Illinois with its principal place of business at 180 North LaSalle Street, Suite 1810, in Chicago, Illinois. At all times relevant to the claims asserted herein, Northstar has conducted business throughout the state of Illinois, including in St. Clair County.

20.     Defendant IGT Global Solutions Corporation is a Delaware corporation with its principal place of business in Providence, Rhode Island. IGT is registered to do business in the state of Illinois and is listed by the Illinois Secretary of State as "active" in the state. At all times relevant to the claims asserted herein, IGT has conducted business throughout the state of Illinois, including in this District. IGT maintains an office in this state, at 3201 Robbins Road, Springfield, Illinois. Dane A. Cox is the General Manager of IGT's Springfield, Illinois office. IGT is, and at all relevant times has been, a member of The Greater Springfield Chamber of Commerce (GSCC). The GSCC website shows IGT as providing "Lottery Services" from the Robbins Road location. Defendant IGT is a member of, part owner of, and, in relation to the claims asserted herein, a vendor to, Defendant Northstar. IGT was previously known as "GTECH."

21.     Defendant Scientific Games International, Inc., is a Delaware corporation with its principal place of business in Alpharetta, Georgia. Sci-Games is registered to do

business in the state of Illinois and is listed by the Illinois Secretary of State as "active" in the state. At all times relevant to the claims asserted herein, Sci-Games has conducted business throughout the <u>state</u> of Illinois, including in this District. Sci-Games maintains offices at 2718 West Roscoe Street, Chicago, Illinois (listed as the "Midwest Region" office on Sci-Games website), and at 3401 North California Ave., Chicago, Illinois. Defendant Sci-Games is a member of, part owner of, and, in relation to the claims asserted herein, a vendor to, Defendant Northstar.

### III.   JURISDICTION AND VENUE

22.   This action <u>was commenced against Northstar</u> on February 6, 2017, <u>by the</u> <u>filing of a Complaint</u> in the Circuit Court for the Twentieth Judicial District, St. Clair County, Illinois. On March 8, 2017, Defendant Northstar removed the action to this Court on the basis of diversity jurisdiction as to Plaintiff Raqqa, and supplemental jurisdiction as to all other plaintiffs.

23.   Defendant Northstar thereafter moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). As to the Rule 12(b)(1) portion of its motion, Northstar contended that the plaintiffs had suffered no injury-in-fact and thus lacked Article III standing to pursue the action; Northstar contended that the Court therefore lacked subject matter jurisdiction and that the action should be dismissed. Dkt. No. 13. Plaintiffs moved to remand on the basis that Northstar had, accordingly, disclaimed subject matter jurisdiction, which was Northstar's burden to demonstrate for purposes of removal, and that if the Court does in fact lack subject matter jurisdiction, then the appropriate remedy is remand. Dkt. No. 15. To the extent this Court <u>ever</u> determines that it lacks subject matter jurisdiction, Plaintiffs maintain that the appropriate remedy is remand.

24.   <u>Plaintiffs filed their First Amended Class Action Complaint (FAC), with</u> <u>leave of Court, on March 26, 2018 (Dkt. No. 75). The FAC added defendants IGT and Sci-</u> <u>Games to the action and added Count VIII (Civil Conspiracy). Plaintiffs filed their Second</u>

Amended Class Action Complaint (SAC), with consent of the parties, on May 4, 2018 (Dkt. No. 83). The SAC added certain plaintiffs to the action. Plaintiffs filed their Third Amended Class Action Complaint (TAC), with consent of the parties and by Order of the Court, on February 28, 2019 (Dkt. No. 146). The TAC reflected the dismissal of one plaintiff from the action.

25.     This Court has subject matter jurisdiction over the claims asserted in this Fourth Amended Class Action Complaint under 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of different states. In the alternative, the Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) in that this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which any member of the class of plaintiffs is a citizen of a state different from any defendant.

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this district. Plaintiff Raqqa, Inc.'s business is located within this district, where it sold Illinois Lottery tickets and from which it transacted business with the Illinois Lottery.

## IV.   THE EVENTS

### A.     The Illinois State Lottery

27.     The Illinois Lottery was established in 1974 under the Illinois Lottery Law, 20 ILCS 1605/1 through 27, as amended. It operates as an independent, cabinet-level department of the state of Illinois.

28.     Initially, the lottery sold tickets only for "passive" games that included weekly drawings. Eventually, instant games, daily games, and more interactive offerings were added, including scratch-off games.

7

29.     The Illinois Lottery generated over two billion dollars in sales over its first eight years (combined) and over ten billion dollars in sales during its first fifteen years. From 1988 to 2006, the lottery generated more than $1.5 billion in sales each year. In fiscal year 2007, the Lottery surpassed $2 billion in sales for the first time and it has exceeded that threshold annually every year since. In each of fiscal years 2014 and 2015 the Lottery amassed more than $2.8 billion in sales.

30.     Since 1985, Lottery profits have gone largely to the Illinois Common School Fund, the Capital Projects Fund, and to "Specialty" causes tied to particular games. The Common School Fund receives more than $600 million per year from Lottery revenues. In the current budget-challenged environment, this is funding that the state of Illinois— and particularly Illinois public schools—have come to rely upon. To the extent Defendants have, through their conduct as described below, eroded public confidence in and enthusiasm for the Lottery, they have jeopardized much-needed funding for Illinois public schools and infrastructure.

31.     The Illinois Lottery sells tickets via eligible and accepted point of sale retailers who are licensed by the Department of the Lottery. Typical retailers include gas stations, convenience stores, grocery stores, and the like.

32.     These retailers enter into a valid and enforceable written contract with the Department of the Lottery, known as a Retailer Agreement for Sale of Lottery Tickets ("Retailer Agreement"), or similar. The Retailer Agreement is a license to sell Lottery products under specified terms and conditions and pursuant to which the Lottery agrees to pay retailers certain commissions and bonuses.

33.     Plaintiffs Raqqa, Omdev, Om Riya, and E and B Liquors are retailers of Lottery tickets and parties to such Retailer Agreements.

34.     Under the Retailer Agreements and the terms and conditions incorporated therein, Retailers agree to make available at their point of sale locations lottery tickets for

8

sale to eligible purchasers. The Retailers agree, among other things, to actively work to promote the sale of lottery tickets. Retailers also must allocate space in their point of sale locations for lottery equipment, promotional materials, and signage. Retailers are expected to meet weekly sales targets.

35.     Retailers must expend their own capital for the lottery tickets which they hope to sell from their point-of-sale locations.

36.     Retailers are required to redeem certain winning tickets presented to the Retailer. Other tickets presented to the Retailer are redeemed according to claim procedures the Retailer is required to follow.

37.     Retailers provide labor to sell and redeem tickets at their places of business.

38.     In exchange for allocating facilities and labor for the promotion, sale, and redemption of lottery tickets as described above, Retailers are paid a commission for ticket sales by the Lottery and also receive a bonus for winning tickets sold or redeemed at their locations. For instance, in 2011, Retailers began earning a 1% cashing bonus for paying out prizes of up to $600. Retailers were expected to earn some $10.5 million in extra compensation per year via the cashing bonus. For a grand prize ticket sold at its location, a Retailer can earn a bonus of hundreds of thousands of dollars.

**B.     Northstar Takes Over Management of the Lottery**

39.     In 2010, the state of Illinois decided to privatize the management and operation of the Lottery. The State initiated a formal Request for Proposal ("RFP") process, seeking bids by prospective private managers for the Lottery. Based on its bold projections of increased profits, then-Governor Pat Quinn named Defendant Northstar the first Private Manager of the Illinois Lottery. Northstar took over management effective July 1, 2011; it was the first private company in the nation to manage a state lottery.

40.     Defendant Northstar was formed by Defendants IGT and Sci-Games. Northstar is owned 80% by IGT and 20% by Sci-Games. Northstar was formed by IGT and Sci-Games in Illinois, as an Illinois entity, specifically for the purpose of bidding on the Illinois Lottery's private manager contract.

41.     Defendants IGT and Sci-Games are leading manufacturers of gaming machines and vendors to the lottery and gaming industry. Both have a history of providing services in the state of Illinois.

42.     On or about July 30, 2010, IGT (then known as GTECH) and Sci-Games submitted a "Step 1 response" to the state of Illinois' Request for Proposal. IGT and Sci-Games referred to themselves together as "[o]perating as the Northstar Lottery Group," and having "joined in an alliance to respond to the Private Manager RFP." The submission letter was signed by the President and Chief Executive Officer of IGT (GTECH) and by the President and Chief Executive Officer of Sci-Games. The cover of the proposal prominently displayed the logos for IGT and Sci-Games, along with Northstar. A legend inside the cover asserted that the proposal contained "confidential, proprietary, and/or trade secret information" of Northstar, IGT, and Sci-Games. IGT and Sci-Games signed (under penalty of perjury) certain disclosures made as a part of the proposal as "Offeror/Subcontractor."

43.     According to the Private Management Agreement ("PMA") between the State and Northstar, Northstar agreed to "coordinate and manage Lottery operations and … introduce opportunities for innovation, agility and market responsiveness for the Lottery." The State engaged Northstar in order to "increase sales and Net Income from the Lottery while maintaining the highest levels of integrity and responsibility." The PMA had a stated term of ten years.

44.     Pursuant to the PMA, Northstar was to provide all equipment and perform essentially all functions necessary to operate the Lottery. This included, among other

things, the creation and management of new Lottery game designs, formats, prices, rules, and payout structures, along with management of existing Lottery games. Northstar also was responsible for recruitment, training, and supervision of Lottery Retailers, and the determination of commissions and other incentives for Lottery Retailers. Northstar was responsible for advertising, promotional materials, and general marketing strategy.

45.     As the day-to-day manager of the <u>Lottery</u>, Northstar knew of, or even facilitated, the Lottery's Retailer Agreements with each state-licensed Retailer. Northstar was also aware of the material terms of these agreements, including that Retailers stood to earn commissions in relation to lottery ticket sales and stood to earn bonuses for winning tickets sold or redeemed by the Retailer.

46.     Pursuant to the PMA, Northstar was to prepare game rules consistent with applicable law and was at all times to operate the Lottery in accordance with applicable law.

47.     Pursuant to the PMA, Northstar's payment for operating the Lottery included payment of certain Operating Expenses and Incentive Compensation.

48.     The Operating Expenses were set initially pursuant to Northstar's successful RFP bid. Northstar was paid approximately $130 million for Operating Expenses for each of 2013 and 2014. Operating Expenses were paid out to Northstar on a regular monthly basis.

49.     As Incentive Compensation, Northstar received (subject to several potential adjustments) a percentage of the portion of Lottery Net Income received in a given calendar year that exceeded certain thresholds. For instance, in Contract Year 1, the PMA provided that Northstar would receive 10% of that portion of Net Income exceeding $674 million, 20% of that portion of Net Income exceeding $714 million, and 30% of that portion of Net Income exceeding $754 million. Net Income includes all revenue derived

from the Lottery, less paid prizes, commissions to Lottery Retailers, and Operating Expenses.

50.     To maximize Net Income, Northstar had an incentive to maximize the Lottery's revenues and minimize its payouts of prizes (to Purchasers) and commissions (to Retailers).

51.     In addition to this general financial motivation to increase Lottery Net Income, Northstar also had further motivation.

52.     To win the RFP, Northstar had an incentive to make a relatively *low* bid for Operating Expenses. This is because in evaluating competing bids the State would prefer, all other things being equal, a bid that included a lower amount of set monthly payouts pursuant to the PMA.

53.     The PMA also provides that Northstar's compensation would be adjusted downward (pursuant to set formulas) in the event of a Net Income Shortfall. A Net Income Shortfall occurred where Net Income did not reach certain Net Income Targets as set by Northstar's winning RFP bid (or as set in subsequent year business plans).

54.     To win the RFP, then, Northstar also had an incentive to make a relatively *high* bid for annual Net Income Targets. This is because in evaluating the competing bids the State would prefer, all other things being equal, a bid that allowed it to minimize payments to the manager. The higher the Net Income Targets, the greater the likelihood that Net Income Shortfalls would occur and payments to the private manager would be reduced. In fact, Net Income Shortfalls occurred for each of the years ending June 30, 2012, 2013, and 2014.

55.     In light of its motivation to bid low for Operating Expenses, but high for Net Income Targets, Northstar had a strong financial motivation to cover its risk on both of these fronts by increasing the Net Income of the Lottery. As noted above, this

motivation is in addition to the general motivation to maximize its Incentive Compensation percentage by reaching the higher Net Income tiers.

56.     To increase the Net Income of the Lottery, Northstar sought to increase Lottery revenues, i.e., ticket sales, while reducing prize payouts to Purchasers and commissions and bonuses to Retailers.

57.     Northstar successfully boosted lottery ticket sales by hundreds of millions of dollars in each of its first three years as Private Manager. Northstar also managed to reduce prize payouts, as described below.

## C.     IGT's and Sci-Games' Participation in Operation of the Illinois Lottery

58.     Defendants IGT and Sci-Games created Northstar for the specific purpose of bidding on the Illinois Lottery's private manager RFP, winning that contest, and operating the Illinois Lottery.

59.     Northstar entered into vendor agreements with IGT and Sci-Games as "sub-contractors" to perform certain functions relating to operation of the Illinois Lottery.

60.     Defendants IGT and Sci-Games provided similar services to the Illinois Lottery before they created Northstar and before Northstar was awarded the PMA contract.

61.     Under the PMA, Northstar was required to include in its subcontracts with vendors (including IGT and Sci-Games) a provision stating that vendor services are provided "for the benefit of the State, as well as flow-down provisions." By acting as vendors, IGT and Sci-Games have transacted, or continue to transact, business in this state relevant to the claims asserted herein.

62.     Through their creation, ownership, and control of Northstar, and through their participation as described herein, IGT and Sci-Games had all the same incentives and Illinois Lottery operational knowledge attributable to Northstar.

63.     At the times relevant to this complaint, Northstar performed very few of the overall functions of operating the Illinois Lottery on its own. Many of the functions are or were, instead, performed by IGT and Sci-Games.

64.     For instance, IGT provided the gaming systems, retail equipment, networks, and the internet platform for operation of the Lottery.

65.     IGT also provided the relevant databases used to operate, analyze, and track, lottery functions. These include the "Enterprise Services" ("E.S.") database, an analytics database, a "Business Objects" database or utility, and a player database.

66.     In fact, in operating the Illinois Lottery, Northstar did not provide any of its own services from a technology standpoint; these services were all provided by IGT. IGT (and not Northstar) owns this technology.

67.     Northstar users had access to certain of IGT's technology systems, or to output from those systems, for purposes of operating the Illinois Lottery.

68.     Northstar and Sci-Games representatives participated in the decision-making process on what new lottery games should be created and offered, and on what terms.

69.     Sci-Games provided Northstar and the Illinois Lottery with access to its private "Game Gallery" website that shows options for game parameters, including artwork, ticket price, and other game characteristics. Based on its experience with lotteries in other states, Sci-Games rated the various offerings with "index numbers" that it calculates.

70.     Based on criteria or desires that Northstar communicated, Sci-Games then "built" a prize structure for new games. Sci-Games created "working papers" describing each game and recommended prize structures for the games. Sci-Games was responsible for the game programming, production, manufacturing, printing, and packaging of each game operated by Northstar.

14

71.     When a new game is created, packs of tickets are printed and distributed to retailers or sent to a warehouse for storage. Defendant Sci-Games participated in and made a recommendation on what tickets should go into the retail market and what tickets should be stored in a warehouse.

72.     As described below, Defendants designed games so that tickets would be made available for retail sale in a sequential fashion.

73.     Sci-Games provided data that allowed IGT's E.S. database to know precisely how many winning tickets are within any given pack of tickets.

74.     The IGT E.S. system determined approximate daily sales based on percentages of tickets validated (turned in for prizes).

75.     Sales of lottery tickets, for Defendants' tracking purposes, were managed by IGT's proprietary systems.

76.     An IGT proprietary algorithm determined when 90% of the low-value tickets in a given ticket pack were sold. Once this has occurred (or 90 days had passed), the IGT system automatically invoiced the retailer for settlement of the ticket pack purchase. IGT also then provided a weekly EFT file to the Lottery's bank that swept the amount owed by each retailer from the retailers' bank accounts.

77.     IGT and Sci-Games provided further functionality with Northstar for the Lottery, as described in their operating agreements, in the Lottery PMA, and/or in their vendor agreements.

**D.     Defendants Implement a Scheme to Unlawfully Maximize Profits at the Expense of Plaintiffs by Misstating the Odds of Winning Grand Prizes in At Least Three Ways**

78.     In operating the Lottery, Defendants designed, planned, and offered hundreds of new instant lottery games. Instant games represented a potential means to dramatically increase ticket sales and profits for the Lottery.

15

79.     Instant games are preplanned, self-contained products. Each game pays for its planned prizes from the money <u>the game generates</u> in sales. A set number of tickets are planned and printed ahead of time, along with a prize structure. The purported odds of winning are published on the tickets themselves <u>and</u> elsewhere.

80.     <u>In order to increase ticket sales for instant games, Defendants decided to offer bigger grand prizes. In order to do this, they had to design games that included significantly more tickets. Indeed, according</u> to an investigation conducted by the *Chicago Tribune*, Northstar employed a practice of ordering far more tickets than reasonably could be expected to sell. <u>This represented a sharp change in practice for the Lottery.</u>

81.     <u>For comparison, Illinois instant games typically have involved a pre-set number of tickets such that *the complete game would sell out*. For instance, in 2005 (pre-Northstar) the Lottery offered its first $20 instant ticket game. Total prizes were set at $50 million, with three top prizes of $2 million each. The game sold out weeks ahead of schedule.</u>

82.     <u>In 2007 (pre-Northstar), the Lottery offered a St. Patrick's Day game in which 500,000 tickets at $20 each sold out in approximately three weeks leading up to the holiday. Pre-set allotments of hundreds of thousands of tickets for other similar games (and annual St. Patrick's Day games) routinely sold out quickly.</u>

### *1.     Defendants Misstate the Grand Prize-Winning Odds of "Game 909" By Almost Ten Percent*

83.     <u>Beginning in 2013, Defendants created a new instant game called The Good Life - $30,000 a week for 30 years (also known as "Game 909"). Game 909 was part of series of games called The Good Life Series.</u>

84.     <u>Game 909 was designed to include 14,040,000 tickets at a cost of $30 per ticket.</u>

85.     Game 909 was designed as offering two grand prizes of $30,000 per week for 30 years, which was the largest prize ever offered by the Illinois Lottery for an instant ticket scratch-off game.

86.     Documents produced by Defendants in discovery demonstrate that ticket printing for Game 909 took place in two separate batches. The first batch of tickets for Game 909 contained 7,702,380 tickets, including one grand prize-winning ticket, and these game tickets went on sale on September 3, 2013.

87.     Defendants represented on the tickets that the odds of winning a grand prize in Game 909 were 1 in 7,020,000 (i.e., 2 grand prize winners in 14,040,000 tickets).

88.     Documents produced by Defendants in discovery also demonstrate that the second batch of tickets for Game 909, which contained the remaining 6,337,620 tickets, was not printed until July 21, 2014 and the game was terminated before any tickets from the second batch went on sale.

89.     During the entire time Game 909 was on sale, Defendants represented that there were two grand prize tickets available for purchase, when in fact, the entire time tickets for the game were being sold, only a single grand prize ticket was available for purchase.

90.     Defendants never made the second batch of 6,337,620 tickets available for purchase. Thus, the true odds of winning a grand prize in Game 909 were, at best, 1 in 7,702,380, rather than 1 in 7,020,000. Defendants accordingly overstated the odds of winning a grand prize in Game 909 by almost ten percent.

   **2.    *Defendants Overstate the Odds of Winning by Failing to Account for or Disclose a Practice of Terminating Games Early When to Do So Served Game Profitability***

91.     At the times Defendants initiated games, they had a plan to end games early if doing so served game profitability. For instance, if Defendants decided that ticket sales revenue for a game outpaced predicted game payouts so that the Lottery was "ahead" in

17

that game and risked losing this advantage if a grand prize ticket was sold and redeemed, Defendants often simply terminated the game early. This preexisting plan to terminate games early if doing so was financially advantageous to Defendants was a necessary factor in determining the true odds of winning a grand prize in any game—just like the total number of tickets and the total number of grand prizes available were necessary factors in setting the true odds of winning a grand prize. However, Defendants did not take the potential-early-termination factor into account when stating the odds of winning a grand prize. Thus, the odds stated by the Defendants were *potentially* wrong for each game at the time each game started, and were *in fact* wrong at the time each game started for every game the Defendants actually terminated early.

92.     Defendants failed to disclose at the times they initiated games, that they had they had the foregoing plan to (potentially) end games early and Defendants did not take this into account in setting the odds they published for any games. All ticket purchasers who did not win a grand prize for games that were terminated early suffered injury by Defendants' failure to disclose their preexisting plan and failure to account for the plan in the odds they published. These purchasers did not receive what they bargained for—a chance to win a grand prize at the odds stated by Defendants.

93.     Defendants' scheme to terminate some games early to maximize profits relied in large measure on Defendants' offering of bigger grand prizes in order to generate more sales. Defendants were able to advertise bigger grand prizes, thus attracting more ticket sales, by designing instant games that included far more tickets than reasonably could be expected to sell.

94.     Defendants' practice of discontinuing games before all—or sometimes before *any*—grand prizes had been awarded for the game was uncovered by the *Tribune* investigation and is confirmed by discovery in this lawsuit.

95.     For instance, in 2012 Northstar initiated a $5 instant ticket game called "Birthday Surprise" for which it ordered a print of nearly 10 million tickets. This was more than 3.5 times the number of tickets the <u>state</u> ordinarily would sell for a $5 game. Birthday Surprise ostensibly was to include two grand prize winners, each entitled to a $150,000 immediate pay-out along with $150,000 on the winner's birthday for 20 years. The first grand prize was awarded in March 2013, but that same month—and despite internally calling Birthday Surprise a "current player favorite and well performing" game—Northstar planned to discontinue the game. Birthday Surprise was <u>terminated</u> with only 64% of its tickets sold and the second grand prize was never awarded.

96.     Just ten weeks later, <u>though</u>, a new (and nearly identical) "Birthday Surprise" game commenced, with the same <u>pre-planned</u> prize structure and number of tickets as the original. Northstar ended this game within ten months, with only 49% of the tickets sold. No grand prizes were awarded.

97.     <u>Four of the five games in The Good Life Series included grand prizes worth over $1,000,000: "$2,000 A Week for 20 Years" (Game 875); "$5,000 A Week for 20 Years" (Game 876); "$10,000 A Week for 20 Years," (Game 877); and "$30,000 A Week for 30 Years" (Game 909).[1] Of the twelve available grand prizes across the four games, only three were ever awarded. No grand prizes were awarded for "$10,000 A Week for 20 Years" (Game 877) or for "$30,000 A Week for 30 Years" (Game 909). In all four games, Defendants paid out a smaller percentage of ticket sales revenue than the games were designed to pay. In Game 877 and Game 909 Defendants paid about 12% and 16% less than the games were designed to pay, respectively.</u>

98.     <u>In late</u> 2013, Northstar began selling tickets for "The Good Life - <u>$30,000 a week for 30 years</u>" (also known as Game 909, discussed above). According to

---

[1]     <u>The fifth game in The Good Life series, Game 874, was called "1,000 A Week for 20 years." The then-present value of its grand prize was less than $1 million.</u>

the *Tribune* investigation, the game was designed to pay out <u>21.38%</u> in <u>grand</u> prizes, <u>40.14% in lower</u> prizes, <u>and 38.48% in what the defendants call "break even prizes."</u>[2] Thus almost <u>60% of the ticket sales revenue potentially payable back to players was accounted for by the "break-even prizes" (which players frequently simply reinvested in purchasing additional lottery tickets) and grand prize tickets (which were not paid). For tickets printed in the first print batch, 39.21% of potential winnings was accounted for by the "break even prize" money and 19.85% of potential winnings was accounted for by a grand prize ticket that was never sold. Defendants terminated Game 909</u> when fewer than 15% of the printed tickets were sold and no grand prizes had been awarded. Game 909 generated $63 million in sales and paid out $38 million in smaller prizes <u>and "break even prizes."</u>

99.    Defendants' scheme to inflate ticket sales and reduce prize payouts extended to other games. The specific games discussed above are for illustrative purposes only. Defendants' scheme to reduce prize payouts in order to increase profits was an aggregate scheme that ran across all scratch-off games.

100.    According to the *Tribune* investigation, for the biggest instant games, <u>games with over $1,000,000 in prizes,</u> the Lottery did not award 23 grand prizes, representing more than 40% of the <u>total grand prize-winning tickets for</u> those games.

101.    <u>Documents produced by Northstar in this suit demonstrate that for the seventeen games initiated by Northstar between 2011 and ended before June 28, 2015 that had a grand prize of greater than $1,000,000, only 34.5% of the available grand prize money was actually paid out. Fourteen of the seventeen games were discontinued before</u>

---

[2]    <u>So-called break even prizes are payouts that return to the player the purchase price of the ticket. They were neither break even nor prizes. Players do not win or even break even when they receive $30 back on a ticket that cost $30 because players receive nothing for this risk they took in purchasing the ticket.</u>

paying out all grand prizes[3], including three games that were discontinued before paying out *any* grand prizes.[4] Two of the games that were discontinued before any grand prizes were awarded had a combined total of almost $95 million allotted for grand prizes, none of which was awarded.[5] The low payout rates reflected a drastic change in practice for the Lottery and drew a sharp contrast with lotteries run by other states not subject to private management interests.

102.    According to the *Tribune* investigation, for the six years preceding Northstar's management of the Lottery, Illinois awarded 87.5% of the grand prizes that its big prize games were designed to pay out. This figure is comparable with the award percentages of other state lotteries. The *Tribune* found, however, that under Northstar, the Lottery award rate dropped to 59.6%. An award rate decrease of this magnitude is not explainable as happenstance or attributable to a lack of interest in the Lottery — indeed, ticket sales were up under Northstar. Rather, it reflects Northstar's implementation of a practice designed and orchestrated by Defendants of discontinuing games early when the profitability of the game was statistically maximized. Because Defendants knew with a reasonable degree of certainty how many tickets had been sold for a game at any given time, how many prizes (and grand prizes) had been claimed for the game, and what the commensurate profitability of the remaining unsold tickets was, Northstar was in a position to, and did, discontinue games before winning tickets could be sold.

103.    Defendants' early termination of games was not left to chance. Evidence generated in discovery demonstrates that Defendants tracked game profitability.

---

[3]    Games 831, 835, 858, 872, 875, 876, 877, 889, 902, 908, 909, 918, 924, and 944.

[4]    Games 877, 908, and 909.

[5]    Games 877 and 909.

104.     The purpose of Defendants' early termination of games was to avoid selling too many grand prize-winning tickets. Documents obtained in discovery establish that Defendants intentionally terminated games for the express purpose of avoiding having to pay out certain grand prizes. As evidenced by a January 22, 2014 email to Northstar VP of Sales and Marketing Francesco Parola from Northstar Instant Product Manager Karen Harris (who is also a former and current Sci-Games employee), Defendants terminated games early because they could not risk "incurring any additional hits to net income" and they could not "risk a player choosing the annuity which wasn't properly funded by the prize structure[.]" This email pertains to top prizes; annuities were only purchased to cover payouts for top prizes.

105.     Northstar's sworn testimony provided in this lawsuit confirms that the Sci-Games' account manager for the Illinois Lottery and Northstar's product manager took part in the decision-making process regarding the termination of scratch-off lottery games. The Sci-Games account manager for at least part of the relevant period was Laurie Pierce. The Northstar product managers during the relevant period were Karen Harris and Matthew Hayes.

106.     In implementing this practice, designed to increase its own profitability, Northstar deceived Purchasers who bought tickets believing that the grand prizes would, in fact, be awarded and that their odds of winning were as reflected on the tickets or where otherwise published.

107.     While Defendants alerted purchasers (via terms inscribed on the backs of tickets) that tickets may continue to be sold even if all top prizes in a game have been claimed, they said nothing about the early discontinuation of games before prizes are awarded. In other words, if Defendants believed that they could continue to make money selling tickets for a game without risk of having to pay out further grand prizes (because they already were paid), they disclosed that they may do so. Nowhere, though, did

22

Northstar or any Defendant disclose <u>to purchasers</u> that <u>games might be *discontinued* early in order to ensure</u> that <u>no grand prize (or not all grand prizes) ever would be paid out</u> for that <u>game. Nowhere did Northstar disclose</u> that <u>this practice had an effect on the odds of winning</u> grand prizes <u>in games</u>.

108. <u>Defendants' termination of these games pursuant to their preexisting, undisclosed plan damaged all purchasers of tickets for these games because the odds of winning were overstated from the outset of the games.</u>

109. In addition to deceiving Purchasers, by discontinuing games Defendants minimized or eliminated the possibility that <u>they</u> would have to pay commissions and bonuses to Retailers. Retailers contracted to provide labor and other consideration pursuant to Retailer Agreements in exchange for commissions and bonuses for the sale and/or redemption of winning tickets. Where tickets—and particularly *winning* tickets—went unsold because games were discontinued prematurely, Retailers were deprived of commissions and bonuses.

110. These practices were designed to inflate the profitability of the Lottery at the expense of Purchasers and Retailers, all to result in increased revenues for Northstar and for IGT and Sci-Games. The practices had this effect.

111. Defendants' scheme extended across all scratch-off games. The scheme was first exposed as a part of the *Chicago Tribune* investigation and publication. Prior to publication of the *Tribune* investigation's findings, Defendants' scheme was concealed from Plaintiffs and the public, and was not publicly-known. Even the *Tribune* investigation did not reveal or disclose the full extent of the scheme, which was and is knowable only by way of discovery conducted in this action.

23

### *3.* *Defendants Used "Stratified Random Distribution" as an Undisclosed Scheme to Sell Discrete Groups of Tickets for Which the Odds of Winning a Grand Prize Were Zero*

112.   A lottery is "a chance for a prize for a price." *Black's Law Dictionary*. The fact that each lottery ticket holds out the potential to be a grand prize winner is what makes a lottery a lottery. Grand prizes motivate purchasers to play the lottery. That's why Defendants used the limited space on the face of every lottery ticket to promote the amount of grand prizes in large, bold font; e.g., "Win Up To $200,000!," $5,000 a Week for Twenty Years," "35 $1,000,000 Top Prizes!," "Win Up To $4,000,000," "$3,000,000," "Win Up To $2,000,000," $5,000 a Week for Life!," "Win Up To $15,000,000," "Win Up to $5,000,000." "Win Up to $250,000," "Win Up To $50,000." And they did the same on the back of virtually every lottery ticket.

Following are fronts and backs of tickets from some of the games at issue in this lawsuit:







113.   The stated goal of Northstar's Illinois Lottery Private Manager bid was to increase Lottery sales and profits. To achieve that goal, Northstar increased the purportedly available value of grand prizes for instant games it designed upon taking over operation of the Lottery.

114.    Each time Defendants validated a grand prize winner, i.e., confirmed a purchaser had won a grand prize, they immediately issued press releases, conducted media interviews, and otherwise promoted the winning of the grand prize. They did this in order to induce Purchasers to buy more tickets.

115.    Northstar's Parola inquired of its Product Manager Matt Hayes about the extent to which Northstar could promote games by highlighting the availability of grand prizes by asking, for example, whether they could advertise that "we still have all 4 100x 4M winning tickets unpaid[.]"

116.    Given the importance of grand prizes to lottery ticket purchasers, if the operator of a lottery sells a discrete (and sizeable) group of tickets that the operator knows has no chance of containing a grand prize ticket, that's not a lottery, it's a scam. Yet through an undisclosed practice called Stratified Random Distribution (SRD), Defendants routinely sold tickets from large, discrete groups of tickets that they *knew* contained no grand prizes—all while misrepresenting that each ticket for sale held the potential to be a grand prize ticket. That was unfair and deceptive and it injured the Plaintiffs.

117.    Defendants used SRD for each instant lottery game during the period they operated the Lottery. They never disclosed the practice to purchasers. The practice enabled them to sell large numbers of lottery tickets knowing with certainty none of the tickets was a grand prize winner. Defendants used SRD even though the Illinois Lottery expressed to Defendants serious concerns about the litigation risk associated with selling discrete groups of tickets the Defendants knew did not contain a grand prize ticket.

118.    SRD worked as follows. For each instant game, a predetermined number of tickets was planned and printed, along with a prize structure. A prize structure is the number of winners per game, i.e. 1,000 - $1 winners, 500 - $2 winners, 250 - $5 winners, etc. All printed tickets were divided into separate strata, with each stratum containing an

equal number of tickets. Each stratum also typically contained an equal number of grand prize tickets. The grand prize tickets were distributed *within each stratum*, hence the name stratified random distribution.

119.   Defendants sold the multiple strata under a single game name used for marketing purposes, e.g., Birthday Surprise. However, as designed with respect to grand prize-winning tickets, each stratum was in effect a separate, stand-alone game, with its own predetermined number of tickets, predetermined prize structure, and predetermined odds. And when the final grand prize from a stratum was validated, no more grand prizes were available in that stratum no matter how many tickets in that stratum remained unsold.

120.   After Defendants created multiple strata under a single game name, they sequentially distributed the tickets to retailers, with the first tickets from the first stratum distributed for sale first and the last tickets from the final stratum distributed for sale last, if at all. As a result of this sequential distribution of strata and tickets within strata, virtually all tickets from one stratum were sold before virtually any tickets from next stratum were sold.[6] Through the practice of SRD, Defendants intended to, and did, minimize simultaneous ticket sales from more than one stratum. This minimized the likelihood that a grand prize ticket from a stratum would be sold before all tickets from the preceding stratum were sold. Defendants used SRD, rather than actual random distribution of grand prize tickets within a game structure, to ensure that not all grand prize tickets were sold early in a game and to ensure that some grand prizes tickets would not be sold until late in a game, if at all. So, once the final grand prize ticket from a stratum was sold, the remaining tickets in that same stratum—which Defendants knew contained *no* grand prize ticket—would have to be sold before tickets from the next stratum—which

---

[6]   To ensure continuous availability for sale of tickets for a game, some minor overlap occurred during which the last tickets from one stratum were for sale when the first tickets from the subsequent stratum went on sale.

Defendants knew *did* contain a grand prize or prizes—could be sold. Defendants thus knew of discrete, identifiable groups of tickets they sold which had no chance of producing a grand prize ticket. Even so, they never disclosed this and they affirmatively represented that grand prize tickets remained available in the game.

121.   By contrast, when the final grand prize ticket in a *game* was validated by the Defendants (assuming the game was not terminated earlier), Defendants knew that no more grand prize tickets were available to be won in that *game*. Thus when the final grand prize ticket in a *game* (which would typically be the final grand prize ticket in the final stratum of a game) was validated, Defendants immediately began "cleaning up" the game, i.e., they commenced the process of terminating the game and pulling it from the market. They also did so to avoid *the appearance* that they were selling from a large, discrete group of tickets they knew contained no grand prize tickets – as doing so would be unfair and deceptive.

122.   Because each stratum in a game is, itself, effectively a self-contained game, there is no rational basis for treating the final stratum in a game differently than the preceding strata with respect to initiating the cleanup process. In the same way Defendants knew that when the final grand prize in a game was validated the remaining unsold tickets in that game contained no grand prize tickets, Defendants also knew that when the final grand prize ticket in *any stratum* was validated, no more grand prize tickets were available to be won in that stratum. Purchasers, by contrast, neither knew nor could have known Defendants were selling tickets from discrete groups of tickets that had no chance of containing a grand prize ticket because Defendants never disclosed the SRD practice.

123.   In contrast to Defendants' cleanup and termination of a game when the final grand prize ticket in a *game* was validated, when the final grand prize ticket in a *stratum* other than the final stratum in a game was validated, Defendants continued to

sell tickets from that stratum. They did so while knowing that no more grand prize tickets were available to be won in that stratum. In contrast to the *appearance* Defendants were trying to maintain (*see supra* paragraph 121,) they were *in fact* selling tickets from a large and discrete group of tickets they knew did not contain any grand prize tickets. This was unfair. At the same time they were selling from a large, discrete group of tickets that they knew had no chance of containing a grand prize, Defendants continued to advertise at the point and sale, the Lottery website, and elsewhere that each ticket for sale held out the potential of being a grand prize ticket. In fact, if a purchaser looked at the "Remaining Instant Game Prize List" (which list Defendants promoted on the back of each instant lottery ticket, *see supra* paragraph 112), she would see one or more grand prizes was ostensibly available. That is, she would see a representation that a grand prize remained available such that each ticket for sale held the potential to be a grand prize ticket. And if a purchaser looked at the face of the instant ticket she was considering purchasing, she would see the grand prize prominently advertised as being available. This was false and therefore deceptive.

124.    The following hypothetical illustrates how SRD worked in practice. In a hypothetical game for which 30 million tickets are printed, including three grand prize tickets, each stratum would be comprised of ten million tickets. One grand prize ticket would be randomly distributed within the first stratum, one grand prize ticket would be randomly distributed within the second stratum, and one grand prize ticket would be randomly distributed within the third stratum. Defendants would then begin distributing the tickets to retailers sequentially, beginning with the first tickets in the first stratum—leaving the remaining tickets in the warehouse and not yet available for sale. When virtually all tickets from the first stratum were sold, Defendants would then begin distributing the first tickets from the second stratum to retailers.

125.   If, in this hypothetical, the grand prize ticket from the first stratum was validated at the time the five-millionth ticket in the first stratum was sold, five million tickets would remain unsold in that first stratum. Thus, upon validation of the final grand prize in that stratum, Defendants would know that none of the five million unsold tickets in the first stratum could be a grand prize ticket. At this time, the "Remaining Instant Game Prize List" appearing on the Lottery website and promoted on the back of each instant lottery ticket would show two grand prize tickets remained to be sold. And each of the unsold five million tickets would prominently advertise the grand prize as being available. In fact, no grand prize-winning ticket would be available until the remaining five million tickets from the first stratum were sold.

126.   Despite the fact that none of the remaining five million tickets in the first stratum held out the possibility of being a grand prize ticket, Defendants would continue to sell the remaining tickets in the first stratum. This would enable Defendants to sell five million tickets from the first stratum with no risk and a massive upside. Purchasers, by contrast, would pay the purchase price for the five million tickets while unknowingly having no chance of winning a grand prize from that group of five million tickets. This unfair and deceptive practice injured purchasers.

127.   The same process would play out in the second stratum. Again, every ticket purchase from any stratum (other than the final stratum in a game) after the final grand prize in the stratum was validated was sold under deceptive pretenses and injured purchasers because Defendants knew each such ticket lacked any chance of being a grand prize ticket.

128.   When the grand prize ticket in the final stratum was validated, such that no grand prize-winning tickets remained available for the entire game, Defendants would terminate the game and cease selling tickets for the game. It was only upon validation of

the final grand prize ticket in the final stratum that the "Remaining Instant Game Prize List" would show no grand prizes remained.

129.    As the above hypothetical shows, SRD allowed the Defendants to knowingly sell large, discrete groups of millions of tickets with no risk the tickets were grand prize winners. Conversely, SRD forced lottery-playing purchasers to spend millions of dollars on tickets that unbeknownst to them did not hold out the potential to be a grand prize.

130.    Defendants knew that selling from a large, discrete groups of tickets that had no chance of containing a grand prize was improper. This is why they began cleaning up and terminating games as soon as the final grand prize ticket in a game was validated.

131.    In fact, the Lottery put Defendants on notice of the risk of litigation associated with continuing to sell tickets from groups of tickets they knew did not contain a grand prize. An email from Karen Harris, Northstar's Instant Product Manager, to Scott Howarth, IGT's Vice President of Operations for Lottery Management Services, reads:

> Julie Johnson [the manager of the Illinois Lottery in charge of communicating with Northstar] got back to me today; there are not any legal requirements that state that the Lottery must clean up a game when the last top prize is won. *That being said, the state weighs that against a potential lawsuit if the top prize is not available when a game is still on sale and not in cleanup.* We changed the ticket back language last year per Connie so that we wouldn't have to clean up a game after the last top prize is won.
> I assume now we will be cleaning up games when the last top prize is won. Let me know if this is different. Will finish up procedures tomorrow and provide it to you for review (emphasis added).

132.    Despite knowing that once the final grand prize winning ticket in a stratum was validated there was a large, discrete group of tickets for which no grand prize winning tickets were available for purchase, Defendants induced consumers to purchase

tickets by advertising that someone had won a grand prize, advertising on the Lottery website that more grand prizes were available, and advertising at the point of sale that each ticket held out the potential to be a grand prize.

133.    Defendants had the technological capacity clean up and terminate a stratum within a game upon validation of the final grand prize in that stratum. Defendants' failure to begin cleaning up a stratum once the final grand prize ticket in that stratum was redeemed was unfair. Defendants' failure to disclose the details of its SRD was deceptive.

134.    In addition to the foregoing, SRD also facilitated Defendants' unlawful practice of terminating games early when sufficient profitability was reached, *supra* paragraphs 91-111. It did so by ensuring that not all winning tickets would be sold early in a game and that some would not be sold until late in a game, if at all. This increased the opportunity for profit-maximizing early game termination when ticket sales as a percentage of all tickets in a game sufficiently outpaced game payouts as a percentage of all payouts potentially available in that game.

135.    Defendants' conduct described in this complaint was outrageous because the Defendants' motive was evil and their acts showed a reckless disregard of the Plaintiffs' rights.

**E.    The State of Illinois Terminates the Northstar Contract**

136.    Although the PMA was not set to expire until at least 2020, in December 2014 the state delivered to Northstar a Termination Notice. The Attorney General subsequently disapproved of a negotiated termination agreement entered into between the state and Northstar.

137.    Illinois Governor Bruce Rauner then fired Northstar in September 2015. The state reached a termination agreement with Northstar that removed Northstar as Lottery

private manager effective January 1, 2017, or whenever a replacement <u>would</u> thereafter <u>be</u> chosen.

138.    As a part of the separation, Defendant IGT negotiated a "residual value" benefit that requires the new Illinois Lottery private manager either to continue to use IGT as its vendor, or to pay to IGT up to $14 million per year for up to four years.

139.    <u>In September 2017, the state ultimately awarded the new lottery PMA contract to Camelot. Upon winning the contract for the PMA, Camelot pledged to reverse the Northstar practice of designing games that included more tickets than reasonably could be sold. According to the *Chicago Tribune*, Camelot said it would "do a better job of designing and testing games to ensure only enough tickets were printed that they believed could be reasonably sold."</u>

## V.    FACTS PERTAINING TO THE REPRESENTATIVE PLAINTIFFS

### A.    Retailer Plaintiffs

140.    Plaintiffs Raqqa, Omdev, Om Riya, and E and B Liquors are Retailers of Illinois Lottery tickets and parties to Retailer Agreements with the Illinois Department of the Lottery.

141.    Under the Retailer Agreements, the Retailer Plaintiffs provide and have provided, among other things, labor and facilities in order to make lottery tickets available for sale at their business locations. The Retailer Plaintiffs were and are required to redeem certain winning tickets presented to them.

142.    In exchange for the consideration they provide as described above, the Retailer Plaintiffs are entitled to be paid a commission for ticket sales and also to receive a bonus for winning tickets sold or redeemed at their locations.

143.    As the manager and facilitator of Retailer Agreements, Defendant Northstar was and is aware of Plaintiffs Raqqa's, Omdev's, Om Riya's, and E and B

Liquors' Retailer Agreements with the Illinois Lottery, and was and is aware of the material terms of those contracts.

144.    By discontinuing Illinois Lottery games before all—or sometimes before *any*—grand prizes were awarded, Defendant Northstar interfered intentionally and unreasonably in the Retailer Plaintiffs' contractual relationships with the Department of the Lottery and with the Retailer Plaintiffs' reasonable economic expectations of commissions and bonuses.

145.    Defendant Northstar's interference caused a breach of the Retailer Agreement and/or interference with the Retailer Plaintiffs' business expectancies in that the Retailer Plaintiffs did not receive the full benefit of the bargains for which they provided consideration.

146.    As a result of Defendant Northstar's interference, Plaintiffs Raqqa, Omdev, Om Riya, and E and B Liquors were damaged.

147.    IGT and Sci-Games helped plan, participated in, aided and abetted, and helped carry out this interference through the scheme described herein.

**B.    Purchaser Plaintiffs**

148.    Between 2011 and the present, Plaintiff Cairo regularly purchased Illinois Lottery instant game tickets, including tickets for games described above and specifically including Game 909.

149.    Between 2011 and the present, Plaintiff Van Lente regularly purchased Illinois Lottery instant game tickets, including tickets for many of the games described above.

150.    Defendant Northstar designed, planned, and carried out each of these Illinois Lottery instant games. As a part of this, Northstar promoted and advertised the games, determined the ticket price(s) for each game, decided how many tickets would be printed, designed those tickets, and determined what purported odds of winning would

36

be identified on the tickets and/or elsewhere. Northstar also decided what prizes would be awarded for the games, when tickets would be sold, and when the games would be ended. <u>Northstar also implemented SRD for each game offered while Northstar acted as Private Manager of the Lottery.</u>

151.    In light of Defendant Northstar's scheme of discontinuing games early in order to maximize profitability without paying out prizes, the stated odds of winning these games were materially misleading.

152.    Defendant Northstar knew that these odds were materially misleading and intended that Purchasers, such as Plaintiffs Cairo and Van Lente would rely on these materially misleading odds when purchasing tickets.

153.    <u>Northstar performed these acts together with, at the direction of, and/or with the assistance of IGT and Sci-Games.</u>

154.    Plaintiffs Cairo and Van Lente did reasonably rely on the stated odds of winning incorporated into the instant games for which they bought tickets.

155.    Plaintiffs Cairo and Van Lente's opportunities to win were not as stated by Northstar on the tickets.

156.    Plaintiffs Cairo and Van Lente accordingly were damaged.

## VI.   CLASS ALLEGATIONS

157.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action for themselves individually and as representatives of classes of all other similarly situated persons. Plaintiffs intend to seek certification of at least <u>four</u> classes: (a) the "Retailer Class"; (b) the "Purchaser <u>Early Termination</u> Class" (c) the "Purchaser <u>Game 909 Class"; and (d) the "Purchaser SRD</u> Class." <u>The Purchaser Early Termination Class, the Purchaser Game 909 Class and the "Purchaser SRD Class"</u> are sometimes referred to collectively as the "<u>Purchaser</u> Classes." <u>The Retailer Class and the Purchaser Classes are sometimes referred to collectively as "the Classes."</u>

158.    Plaintiffs initially describe the Retailer Class as:

All persons who were or are parties to a contract to sell at retail Illinois Lottery instant game tickets at any time between July 1, 2011 and the <u>date Northstar ceased acting as the Private Manager of the Illinois Lottery.</u>

159.    Plaintiffs initially describe the Purchaser <u>Early Termination</u> Class as:

All natural persons who purchased one or more Illinois Lottery instant game tickets <u>for one or more games Northstar terminated before all grand prizes were sold and who did not win a grand prize in said game(s).</u>

160.    <u>Plaintiffs initially describe the Purchaser Game 909 Class as:</u>

<u>All natural persons who purchased one or more Illinois Lottery instant game tickets for Game 909.</u>

161.    <u>Plaintiffs initially describe the Purchaser SRD Class as:</u>

<u>All natural persons who purchased one or more Illinois Lottery instant game tickets in a stratum (other than the final stratum of a game) after the final grand prize in that stratum was validated,</u> at any time between July 1, 2011 and the <u>date Northstar ceased acting as the Private Manager of the Illinois Lottery.</u>

162.    Excluded from the Classes above are Defendants and any of their members, officers or directors and their immediate families, and the Court and its immediate family.

163.    Plaintiffs reserve the right to amend or modify the class definitions and/or to move for certification of a class or classes defined differently than as set forth above depending on the facts or law as discovered in this action.

164.    <u>Numerosity, Fed. R. Civ. P. 23(a)(1):</u> Each of the proposed Classes is sufficiently numerous that joinder of all members of the class is impracticable. Plaintiffs do not know the exact size of the Classes because such information requires discovery necessary to identify the number of Retailers and Purchasers of Illinois Lottery instant game tickets during the relevant time period. The exact number of all class members may

be ascertained by appropriate discovery, but it is Plaintiffs' belief that the Retailer Class numbers at least in the thousands and the Purchaser Class numbers in the hundreds of thousands or more. Class members may be notified of the pending action by email, mail, and by publication as necessary.

165.   <u>Commonality, Fed. R. Civ. P. 23(a)(2):</u> There are questions of fact and law common to each Class or to the Classes together, which common questions predominate over questions affecting only individual members. These common questions include, but are not limited to, the following:

   a.   Whether Defendants implemented a scheme to increase profitability (and their own revenues) at the expense of Retailers and Purchasers;

   b.   Whether Defendants implemented a scheme of ordering more game tickets than reasonably could be sold so that it could falsely advertise, promote, and offer more lucrative <u>grand</u> prizes;

   c.   Whether Defendants implemented a scheme of discontinuing lottery games before grand prizes were awarded;

   d.   Whether Defendants mis-stated the odds of winning on the various game tickets it designed and sold (or where otherwise published);

   e.   Whether <u>Defendants used</u> the <u>practice</u> of <u>SRD</u>;

   f.   <u>Whether Defendants sold discrete groups</u> of <u>tickets from a stratum after</u> the <u>final grand prize in that stratum was validated such that they knew the remaining tickets in the stratum held out no chance of containing a grand prize;</u>

   g.   <u>Whether, prior to validation of the final grand prize in a game, Defendants represented that each ticket for sale held out the prospect of being a grand prize ticket.</u>

h. Whether Defendants knew after validation of the final grand prize in a stratum that no remaining tickets for sale in that stratum held out the prospect of being a grand prize ticket.

i. Whether Defendants' scheme unlawfully interfered with contracts between Retailers and the Department of the Lottery and/or with the economic expectancies of Retailers;

j. Whether Defendants employed a deceptive, misleading, or unfair method of competition;

k. Whether Defendants were unjustly enriched at the expense of Plaintiffs.

166. Typicality, Fed. R. Civ. P. 23(a)(3): The claims of the Representative Plaintiffs are typical of the claims of the members of the Classes. Representative Plaintiffs, like all other members of the Classes, have sustained damages arising from Defendants' conduct, as alleged herein. The Representative Plaintiffs and the members of the Classes were and are similarly or identically harmed by the same unlawful conduct engaged in by Defendants.

167. Adequacy, Fed. R. Civ. P. 23(a)(4): Representative Plaintiffs can and will fairly and adequately represent the interests of the Classes and have no interests that conflict with or are antagonistic to the interests of the Classes. Plaintiffs have retained attorneys who are skilled, competent, and experienced in complex and class action litigation, and who will vigorously assert the claims on behalf of the Class members. No conflict exists between the Representative Plaintiffs and the Classes.

168. Predominance and Superiority, Fed. R. Civ. P. 23(b)(3): The class action is an appropriate method for the fair and efficient adjudication of this controversy given, among other things, the following:

a. Common questions of fact and law predominate over any individual questions that may arise, such that the class action mechanism is superior

40

to other available means for the fair and efficient adjudication of this dispute;

b. There will be enormous economies to the Court and the parties in litigating the common issues in a class action instead of in multiple individual claims;

c. Class treatment is required for optimal resolution of this matter and for limiting the court-awarded reasonable legal expenses incurred by class members;

d. Despite the relatively small size of individual class members' claims, their aggregate volume, coupled with the economies of scale in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with the cost of individual litigation; and

e. The trial of this case as a class action will be fair and efficient because the questions of law and fact which are common to the plaintiff Classes predominate over any individual issues that may arise.

## VII.   CLAIMS FOR RELIEF

### COUNT I

### Tortious Interference with Contract

### (Retailer Plaintiff Class against All Defendants)

169. Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 168 as if fully set forth herein.

170. Plaintiffs Raqqa, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class entered into valid and enforceable contracts with the state of Illinois, Department of the Lottery.

171. Retailer Plaintiffs performed all functions required of them under those contracts.

41

172.    Pursuant to those contracts, Plaintiffs Raqqa, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class were entitled to commissions and bonuses in relation to their sale and redemption of winning lottery tickets.

173.    Defendants were aware of the existence of those contracts and of the material terms thereof.

174.    By prematurely discontinuing Lottery games and/or otherwise implementing their scheme to maximize profits at the expense of Plaintiffs, Defendants intentionally and unjustifiably induced breach of Retailer Plaintiffs' contracts in that Retailer Plaintiffs did not receive the benefit of bargain in the form of commissions and bonuses to which they were entitled. This breach was caused by Defendants.

175.    Plaintiffs Raqqa, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class were damaged by proximate reason of the foregoing.

176.    Defendants' conduct described in this claim for relief was outrageous because the Defendants' motive was evil and their acts showed a reckless disregard of the Plaintiffs' rights.

## COUNT II

### Tortious Interference with Prospective Economic Advantage
### (Retailer Plaintiff Class against All Defendants)

177.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 168 as if fully set forth herein.

178.    To the extent Plaintiffs Raqqa, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class did not contract with the state of Illinois, Department of the Lottery, to receive payments for particular Lottery games or for particular ticket sales, they nonetheless had a reasonable expectation of receiving future commissions and bonuses for the sale and/or redemption of Lottery tickets.

179.    Defendants were aware of the existence of Retailer Plaintiffs' expectancy.

180.    By prematurely discontinuing Lottery games and/or otherwise implementing their scheme to maximize profits at the expense of Plaintiffs, Defendants intentionally and unjustifiably interfered with Retailer Plaintiffs' expectancy. This interference resulted in breach or termination of Plaintiffs' expectancy, in that Retailer Plaintiffs did not receive their reasonably expected commissions and bonuses for the sale and/or redemption of future Lottery tickets.

181.    Plaintiffs Raqqa, Omdev, Om Riya, E and B Liquors, and the Retailer Plaintiff Class were damaged by proximate reason of the foregoing.

182.    <u>Defendants' conduct described in this complaint was outrageous because the Defendants' motive was evil and their acts showed a reckless disregard of the Plaintiffs' rights.</u>

## COUNT III

### Tortious Interference with Contract
### (Purchaser Plaintiff Class against All Defendants)
### <u>(Deleted)</u>

## COUNT IV

### (Common Law Fraud)
### (Purchaser Plaintiff Class against All Defendants)
### <u>(Deleted)</u>

## COUNT V

### Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505
### (Purchaser Plaintiff <u>Classes</u> against All Defendants)

183.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through <u>168</u> as if fully set forth herein.

43

184.    As manager of the Lottery, Defendant Northstar was responsible for the creation and management of new Lottery game designs, formats, prices, rules, and payout structures, along with management of existing Lottery games. Northstar was also responsible for advertising, promotional materials, and general marketing strategy.

185.    Northstar performed these functions together with, at the direction of, and/or with the assistance of IGT and Sci-Games.

186.    In its management of the Lottery, and with the assistance of and at the direction of IGT and Sci-Games, Northstar implemented a scheme to maximize profits at the expense of Purchaser Plaintiffs by designing, advertising, and offering Lottery instant games in which certain purportedly available grand prizes would never be awarded and/or the stated odds of winning were false or materially misleading.

187.    <u>Defendants failed to disclose their scheme to maximize profits at the expense of Purchaser Plaintiffs by designing, advertising, and offering Lottery instant games in which certain purportedly available grand prizes would never be awarded and/or the stated odds of winning were false or materially misleading.</u>

188.    Defendants knew that some grand prizes would never be awarded and/or that the stated odds of winning were false or materially misleading. Defendants' design, implementation, promotion, advertising, and offering of Lottery instant games was deceptive, misleading, and unfair to Purchasers.

189.    Defendants intended for Plaintiffs Cairo and Van Lente, and for the Purchaser Plaintiff <u>Classes</u>, to rely on the truth of its representations as to the available grand prizes and the odds of winning.

190.    Purchaser Plaintiffs were damaged by proximate reason of the foregoing.

191.    Defendants' conduct as described herein implicates consumer protection generally.

192.   Defendants' conduct described in this claim for relief was outrageous because the Defendants' motive was evil and their acts showed a reckless disregard of the Plaintiffs' rights.

## COUNT VI

### Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505
### (Retailer Plaintiff Class against All Defendants)

193.   Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 168 as if fully set forth herein.

194.   As manager of the Lottery, Defendant Northstar was responsible for the creation and management of new Lottery game designs, formats, prices, rules, and payout structures, along with management of existing Lottery games. Northstar was also responsible for advertising, promotional materials, and general marketing strategy.

195.   Northstar performed these functions together with, at the direction of, and/or with the assistance of IGT and Sci-Games.

196.   In its management of the Lottery, and with the assistance of and at the direction of IGT and Sci-Games, Northstar implemented a scheme to maximize profits at the expense of Plaintiffs by designing, advertising, and offering Lottery instant games in which certain purportedly available grand prizes would never be awarded and/or the stated odds of winning were false or materially misleading.

197.   Defendants failed to disclose their scheme to maximize profits at the expense of Purchaser Plaintiffs by designing, advertising, and offering Lottery instant games in which certain purportedly available grand prizes would never be awarded and/or the stated odds of winning were false or materially misleading.

198.   Defendants knew that some grand prizes would never be awarded and/or that the stated odds of winning were false or materially misleading. Defendants' design,

45

implementation, promotion, advertising, and offering of Lottery instant games was deceptive, misleading, and an unfair method of competition.

199.    Defendants intended for Plaintiffs Raqqa, Omdev, Om Riya, E and B Liquors, the Retailer Plaintiff Class, and the Purchaser Plaintiff <u>Classes</u> to rely on the truth of their representations as to the available grand prizes and the odds of winning.

200.    Retailer Plaintiffs were damaged by proximate reason of the foregoing.

201.    Defendants' conduct as described herein implicates consumer protection generally.

202.    <u>Defendants conduct described in this claim for relief was outrageous because the Defendants' motive was evil and their acts showed a reckless disregard of the Plaintiffs' rights.</u>

COUNT VII

**Unjust Enrichment**

**(Retailer Plaintiff Class and Purchaser Plaintiff <u>Classes</u> against All Defendants)**

203.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through <u>168</u> as if fully set forth herein.

204.    During the years when it managed the <u>Lottery</u>, Defendant Northstar reaped enormous profits from the operations. Defendants IGT and Sci-Games, too, reaped enormous profits both from their ownership of Northstar as well as from their vendor contracts with Northstar for operation of the <u>Lottery</u>.

205.    Northstar, IGT, and Sci-Games together devised and implemented their scheme to maximize profits at the expense of retailers and purchasers in the operation of the Illinois Lottery.

206.    Plaintiffs Cairo and Van Lente, along with the Purchaser Plaintiff <u>Classes</u>, bought tickets for Lottery games, contributing to the Lottery revenues, to Northstar's compensation, and to IGT's and Sci-Games' profits.

46

207.     Purchaser Plaintiffs contracted for the chance to win certain purportedly available grand prizes which in reality would never be awarded and/or as to which the stated odds of winning were false or materially misleading. Revenues from these purchases inured to the benefit of Northstar (and, ultimately, of IGT and Sci-Games).

208.     Retailer Plaintiffs provided labor and other consideration for the promotion, advertising, and sale and redemption of, Lottery tickets. This consideration inured to the benefit of Northstar (and, ultimately, of IGT and Sci-Games).

209.     By misstating the odds of winning grand prizes and/or otherwise implementing their scheme to maximize profits at the expense of Plaintiffs, Defendants realized the ticket sale profits from Purchaser Plaintiffs' purchases, enabled by Retailer Plaintiffs' labor, but did not permit either Purchasers or Retailers to recoup the benefit of their bargain. Defendants unjustly retained these benefits to the detriment of Plaintiffs, as Defendants have deprived Plaintiffs of their property and labor.

210.     Defendants' retention of the benefit violates fundamental principles of justice, equity, and good conscience.

211.     Defendants accepted the benefit from Plaintiffs and it would be inequitable for Defendants to retain that benefit.

212.     In fairness and equity, Defendants should disgorge the monies by which they have been enriched at the Plaintiffs' expense.

COUNT VIII

Civil Conspiracy

(Retailer Plaintiff Class and Purchaser Plaintiff Classes against All Defendants)

213.     Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 168 as if fully set forth herein.

47

214.     At all times relevant herein, Northstar, IGT, and Sci-Games either jointly, individually, or in any combination of them, entered into an agreement or agreements to commit one or more of the wrongs alleged in Counts I -II and V – VII.

215.     At all times relevant herein, pursuant to and in furtherance of the aforesaid agreement(s), Northstar, IGT, and Sci-Games, either jointly, individually, or in any combination of them, committed one or more of the wrongs alleged in Counts I -II and V - VII.

216.     At all times relevant herein, pursuant to and in furtherance of the aforesaid agreement(s), Northstar, IGT, and Sci-Games, either jointly, individually, or in any combination of them, acted in concert to commit one or more of the wrongs alleged in Counts I – II and V – VII.

217.     One or more of the aforesaid wrongs alleged in Counts I – II and V – VII included overt acts or omissions committed by Northstar, IGT, and/or Sci-Games, either jointly, individually, or in any combination of them, pursuant to and in furtherance of the aforesaid agreement.

218.     As a direct and proximate result of one or more of the aforesaid overt acts or omissions, Plaintiffs have suffered damages.

219.     One or more of the aforesaid overt acts or omissions were committed intentionally, willfully, and with malice.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and on behalf of the Class(es), pray for relief as follows:

   A.  Certifying the Class or Classes identified herein and appointing Plaintiffs and their counsel to represent the Class(es);

   B.  Entering judgment in favor of Plaintiffs and the Classes jointly and severally against Defendants;

48

C. Awarding Plaintiffs and the Classes compensatory damages in an amount according to proof at trial;

D. Awarding to Plaintiffs and the Classes the equitable remedy of disgorgement of Defendants' unjust enrichment, in an amount according to proof at trial;

E. <u>Awarding to Plaintiffs and the Classes punitive damages;</u>

F. Awarding to Plaintiffs their costs incurred in bringing this suit, along with Plaintiffs' attorneys' fees; and

G. Granting such other and further relief as the Court deems appropriate.

Dated: June 14, 2019                    Respectfully submitted,

<u>s/ Tor A. Hoerman</u>
Tor A. Hoerman #6229439
Kenneth Brennan #6239037
Chad Finley #6308995
Tyler Schneider #6313923
**TORHOERMAN LAW LLC**
210 S. Main Street
Edwardsville, Illinois 62025
T: (618) 656-4400
tor@thlawyer.com
kbrennan@thlawyer.com
cfinley@thlawyer.com
tyler@thlawyer.com

Derek Y. Brandt #6228895
Leigh M. Perica #6316856
**MCCUNE WRIGHT AREVALO, LLP**
101 West Vandalia, Suite 200
Edwardsville, Illinois 62025
T: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com

49

Timothy Hoerman #6256097
323 N. Washington Street
Westmont, Illinois 60569
T: (773) 220-5899
email@timhoerman.lawyer

Robert Sprague #2693690
**SPRAGUE & URBAN**
26 E Washington St
Belleville, Illinois 62220
T: (618) 223-8383
rsprague@spragueurban.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2019, I electronically filed the foregoing *Fourth*

*Amended Class Action Complaint* with the Clerk of Court using the CM/ECF system,

which will send notification of such filing(s) to all counsel of record in this action.


/s/ *Tor A. Hoerman*
Tor A. Hoerman